IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

KELLY WHITE,

        Plaintiff,

    vs.                                      Case No. 18-CV-4050-DDC-JPO

CITY OF TOPEKA, ET AL.,

        Defendants.

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS CRUSE AND MACKEY

This is a § 1983 action arising out of the death of Dominique White.  On September 28, 2017, Topeka Police Officers Michael Cruse and Justin Mackey responded to a report of five gunshots fired in Ripley Park.  They located 30-year-old Dominque White who acted suspiciously and was then found to be carrying a handgun.  White evaded the officers' efforts to control him with their hands.  When White ran from the officers while reaching for the handgun in his left pocket, both officers shot him.  White did not survive.

Plaintiff Kelly White, the father of Dominique White, asserts claims individually and as Administrator of the Estate of Dominique White and as next friend for the four minor children of White.  (ECF 1, ¶ 40).  Count I asserts Fourth and Fourteenth Amendment claims of excessive force against Officers Cruse and Mackey.  Count II asserts a *Monell* lack of training claim against the City of Topeka.

The entire contact of Officers Cruse and Mackey with White was captured on body camera video.  This motion seeks summary judgment on Count I against Officers Cruse and

Mackey because the encounter, as captured by the video, establishes that their use of force was objectively reasonable and that they are entitled to qualified immunity.

## ISSUES PRESENTED

Officers Mackey and Cruse are entitled to summary judgment dismissing all claims of plaintiff for the following reasons:

1.      Plaintiff Kelly White individually and as representative of the minor children of Dominique White has no claim based upon the death of Dominique White.

2.      The Fourteenth Amendment does not apply to claims of wrongful seizure or excessive force based on an incident occurring before judicial determination of probable cause for detention.

3.      The use of force by Officers Cruse and Mackey was objectively reasonable under the totality of the circumstances confronting the officers.

4.      Qualified immunity protects Officers Cruse and Mackey from plaintiff's § 1983 claims because they did not violate any clearly established right of Dominique White.

5.      Defendants violated no constitutional duty to provide medical care.

## STATEMENT OF UNCONTROVERTED FACTS

Defendants submit the following statement of uncontroverted facts for the purpose of testing the legal sufficiency of plaintiff's claims and establishing the defense of qualified immunity.  Consistent with the requirements of a motion for summary judgment, the facts herein are based upon the evidence viewed in the light most favorable to the plaintiffs.  Defendants reserve the right to controvert these facts should trial or other proceedings be necessary.

The encounter of Officers Cruse and Mackey with Dominique White was captured on cameras worn by each officer.  Because the Complaint fails to reference the video, it is necessary for defendants to proceed under F.R.Civ.P. 56 rather than F.R.Civ.P. 12(b)(6).

1.     On September 28, 2017, Topeka Police Officers Michael Cruse and Justin Mackey were dispatched to Ripley Park in Topeka, Kansas, to respond to a call that several shots had been fired in the area of the park.  (Cruse Declaration, ¶ 2; Mackey Declaration, ¶ 2).

2.     Ripley Park is a high crime area with gang activity and a high number of reports of gunshots.  (Cruse Declaration, ¶ 3; Mackey Declaration, ¶ 4).

3.     Both Officers Cruse and Mackey separately drove marked Topeka Police vehicles to the park.  (Cruse Declaration, ¶ 4; Mackey Declaration, ¶ 3, Exhibit A, p. 1).

4.     Officer Cruse arrived at the park before Officer Mackey and waited near the northwest corner of the park.  While waiting, Cruse observed only two individuals in the park, a male and a female.  (Cruse Declaration, ¶ 5).

5.     As Officer Mackey was arriving, Cruse began to drive through the park toward the two individuals.  As Cruse approached in his police vehicle, the two individuals separated and began to walk in different directions.  (Cruse Declaration, ¶ 6).

6.     Cruse considered the action of the two individuals as an attempt to divide or elude the officers.  Cruse used the public address system in the patrol vehicle to address the individuals to order them to stop but both continued to walk in separate directions.  (Cruse Declaration, ¶ 6).

7.     Officer Cruse contacted the female from the patrol vehicle.  She told Cruse that she and the male had just had an argument.  Cruse did not perceive the female to be upset, which he considered unusual based upon his experience in responding to calls involving domestic

disputes.  Cruse observed no bulges or other indication that the female carried a weapon, nor did her actions suggest she was attempting to conceal a weapon.  (Cruse Declaration, ¶ 7).

8.      Officer Cruse radioed to Officer Mackey that the male was ignoring him and to stop him.  (Mackey Axon video, 0:00:17-21).

9.      Officer Mackey continued to approach the male, later determined to be Dominique White, in his patrol vehicle.  Mackey used the public address system in the patrol vehicle to address White stating: "Hey man, just hold up.  I have to ask you a question." (Mackey Axon video, 0:00:35-37).

10.     White continued to walk away from Mackey.  Mackey announced a second time: "Hey man, I was going to ask you a really fast question."  (Mackey Axon video, 0:00:44-48).

11.     Both officers approached White in their vehicles as White neared a street.  Both officers exited their patrol vehicles.  Officer Cruse addressed White by "Hey, how are you doing?"  (Mackey Axon video, 0:00:55-1:02).

12.     Cruse told White: "We're only here because we are checking out a gunshot call, okay?"  (Mackey Axon video, 0:01:05-1:10; Cruse Axon video 0:00:34-37).

13.     As the officers approached closer to White on foot, White bent over from a standing position at the waist so that his back was parallel to the ground.  (Mackey Axon video, 0:01:05-1:10).

14.     Cruse asked White: "So why are you ignoring me?"  (Cruse Axon video, 0:00:38-41).

15.     White responded verbally from his bent over position but his response is not audible in the video.  Officer Cruse said, "Okay, I can understand that, but I have nothing to do

with you and your chick, but I have everything to do with you guys' safety and the community's safety." (Cruse Axon video, 0:00:40-52).

16.     After a brief further exchange regarding whether White had heard gunfire and the location of the shots, Officer Cruse began to move away from White but asked, "You gonna be okay? Do you need an ambulance or anything?" (Cruse Axon video, 0:01:06-1:13; Mackey Axon video, 0:01:35-1:45).

17.     White made a further comment not audible on the video. Officer Cruse asked "Why do we scare you?" (Mackey Axon video, 0:01:47-1:52).

18.     Officer Cruse was located to the right side of White. Officer Mackey moved around behind White several feet away from him and brought to Officer Cruse's attention a bulge at the waistband area under the t-shirt of White. (Cruse Axon video, 0:01:16-1:25).

19.     Officer Cruse asked White: "What've you got in your back?" (Cruse Axon video, 0:01:25-1:27).

20.     When Officer Cruse asked White what he had in his back, White reached toward the bulge, causing Cruse to draw his gun and warn White, "Don't reach for anything." (Mackey Axon video, 0:02:00-2:05; Cruse Axon video, 0:01:28-1:39).

21.     White acknowledged, "Sorry, sorry, nothing, it's nothing" while retracting his hand away from his back. (Cruse Axon video, 0:01:30-1:31).

22.     Cruse further cautioned White, "Do me a favor, leave your hands in front of you, straight out." (Mackey Axon video, 0:01:05-2:06; Cruse Axon video, 0:01:31-1:39).

23.     White complied, stretching his arms straight away from his head while maintaining the position with his back parallel to the ground so that his arms were stretched out

from his body parallel with the ground.  (Mackey Axon video, 0:01:06-2:09); Cruse Axon video, 0:01:33-1:40).

24.     Cruse had holstered his gun.  (Mackey Axon video, 0:02:23).

25.     As White began to resist, Mackey ordered: "Stop."  (Mackey Axon video, 0:02:18-2:26).

26.     Officer Mackey approached closer to White's left and began to check White's left side.  White told him not to do that, that "you have no reason to arrest me, Bro."  Officer Mackey said, "Relax.  He has a gun in his pocket.  Lay down.  He has a gun in his pocket."  (Cruse Axon video, 0:01:44-1:50; Mackey Axon video, 0:02:21-2:25; Det. Brown Report, pp. 26-27).

27.     Cruse grabbed White's right wrist with both hands.  (Cruse Axon video, 0:01:50-1:53).

28.     Officer Mackey attempted to hold White's left arm.  Mackey ordered White to "stop."  (Mackey Axon video, 0:02:25-2:26; Det. Brown Report, p. 27).

29.     White broke free from the officers and ran, immediately reaching for his left pocket with his left hand.  (Mackey Axon video, 0:02:30-2:31; Cruse Axon video, 0:01:55-1:58; Det. Brown Report, pp. 30-31).



AXON_Flex_Video_2017-09-28_0934

(Mackey Declaration, Exh. B)

30.     Both officers fired their guns, with all shots occurring in a time span of three seconds or less.  (Mackey Axon video, 0:02:32-2:35; Cruse Axon video, 0:01:58-2:01).

31.     Officer Cruse requested emergency medical, AMR, less than minute after the shots were fired.  (Cruse Axon video, 0:02:39-2:40).

32.     Cruse moved to his patrol vehicle to secure medical supplies.  (Cruse Axon video, 0:03:06-3:40).

33.     Cruse returned to White and began to administer first aid until other officers arrived and took over.  Mackey assisted.  (Cruse Axon video, 0:03:43-6:42).

34.     Before beginning first aid, Cruse removed the gun and additional magazines from White's left pocket.  (Cruse Axon video, 0:04:05-4:10).

35.     The encounter with White, from the time he broke free from the officers' grip until the last shot was fired lasted less than five seconds.  (Mackey Axon video, 0:02:30-2:35).

## ARGUMENTS AND AUTHORITIES

### Standard on Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." F.R.Civ.P. 56(a). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Id*.  Put differently, "[t]he question ... is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Shero v. City of Grove*, 510 F.3d 1196, 1200 (10th Cir. 2007) (quotation omitted).  Courts review summary judgment based on qualified immunity differently than other summary judgment cases. "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009).  Further, when qualified immunity is at issue, the court "considers only the facts that were knowable to the defendant officers."  *White v. Pauly*, __ U.S. __, 137 S.Ct. 548, 550 (2017) (citing *Kingsley v. Hendrickson,* 576 U.S. __, 135 S.Ct. 2466, 2474 (2015)).

### I.   KELLY WHITE AND THE CHILDREN OF DOMINIQUE WHITE HAVE NO CLAIM UNDER 42 U.S.C. § 1983.

The only proper plaintiff to assert claims under 42 U.S.C. § 1983 based upon the death of Dominique White is the Estate of Dominique White.  Kelly White, in his capacity as

Administrator of the Estate of Dominique White, is the appropriate plaintiff to pursue a § 1983 claim based upon the death of Dominique White.  However, White also asserts claims individually and as a representative on behalf of children of Dominique White.  (Complaint ¶ 40 and Prayer).

In a § 1983 death case, the remedy is a survival action that can only be brought by the personal representative of the Estate.  *Berry v. City of Muskogee, Okla.*, 900 F.2d 1489, 1506-07 (10th Cir. 1990); see also *Estate of Fuentes ex rel Fuentes v. Thomas*, 107 F.Supp.2d 1288, 1295 (D. Kan. 2000).  Allegations, such as in plaintiffs' Complaint, that officers violated an individual's Constitutional rights by using excessive force against that individual do not support any claim by relatives of that individual.  *See Trujillo v. Bd. of Cty. Comm'rs of Santa Fe Cty.,* 768 F.2d 1186, 1190 (10th Cir. 1985) (rejecting claim by mother and daughter of victim in absence of showing that officers directed activity toward their relationship with the alleged victim with intent to interfere with that relationship); *Bruner-McMahon v. Hinshaw,* 846 F. Supp. 2d 1177, 1198 (D. Kan. 2012), *aff'd sub nom. Bruner-McMahon v. Jameson,* 566 F. App'x 628 (10th Cir. 2014) ("Because plaintiffs have not alleged or shown that defendants' alleged conduct was directed at them, the Court sustains defendants' motions for summary judgment as to the claims by Bruner's children.").  Plaintiffs do not nor could they allege that the shooting of Dominique White was directed as their association with him when the officers did not even know that White had any offspring.  Because the Complaint does not allege such intent, any claims asserted by Kelly White individually or on behalf of children of Dominique White should be dismissed for failure to state a claim.  *Trujillo, Id.*

Defendants are entitled to summary judgment dismissing the purported claims of Kelly White individually and on behalf of the children of Dominique White.

## II.     THE FOURTEENTH AMENDMENT IS NOT APPLICABLE TO PLAINTIFF'S CLAIMS.

The first task in evaluating a § 1983 excessive force claim is to sort out the precise allegations and what constitutional protections are implicated. *Graham v. Connor,* 490 U.S. 386, 394 (1989). "Determining which amendment applies to an allegation of excessive force requires consideration of 'where the [plaintiff] finds himself in the criminal justice system.'" *Estate of Booker v. Gomez*, 745 F.3d 405, 419 (10th Cir. 2014) (quoting *Porro v. Barnes,* 624 F.3d 1322, 1325 (10th Cir. 2010). The Fourth Amendment prohibition against unreasonable seizures applies to evaluation of claims for use of force "leading up to and including an arrest." *Id.* (quoting *Porro*, 624 F.3d at 1325–26); *see also Graham*, 490 U.S. at 394-95 (excessive force claim "in the context of an arrest or investigatory stop of a free citizen" must be evaluated under the Fourth Amendment). Claims alleging excessive force can be brought under the Fourteenth Amendment only for certain pretrial detainees being held after a judicial determination of probable cause for extended restraint of liberty. *Humes v. Cummings*, No. 18-2123-DDC-GEB, 2018 WL 4600717, at *6 (D. Kan. Sept. 25, 2018) citing *Bell v. Wolfish*, 441 U.S. 520, 536, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

Because use of force occurred in the process of an investigation before White had been before a judge, plaintiffs' claims must be analyzed only under the Fourth Amendment's objective reasonableness standard only. The more general substantive due process standard of the Fourteenth Amendment does not apply. Plaintiffs' § 1983 claims asserted under the Fourteenth Amendment must be dismissed.

Because White was not in custody at the time force was used, plaintiff's claims must be analyzed under the Fourth Amendment's subjective reasonableness standard only. More general

substantive due process standard of the Fourteenth Amendment does not apply.  Plaintiff's

§ 1983 claims asserted under the Fourteenth Amendment must be dismissed.

## III.   OFFICERS CRUSE AND MACKEY HAVE QUALIFIED IMMUNITY PRECLUDING PLAINTIFF'S CLAIMS.[1]

### A.   Officers' qualified immunity should be determined before discovery.

The United States Supreme Court has "repeatedly. . . stressed the importance of resolving

immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224,

227, 112 S.Ct. 534 (1991) (*per curiam*); *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151

(2001) (citations omitted) (receded from on other grounds by *Pearson v. Callahan,* 555 U.S. 223,

129 S.Ct. 808 *2009).  Qualified immunity is "an entitlement not to stand trial or face the other

burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411

(1985): *Saucier v. Katz,* 533 U.S. at 201.  The immunity is "an immunity from suit rather than a

mere defense to liability and, like an absolute immunity, it is effectively lost if a case is

erroneously permitted to go to trial."  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

### B.   Qualified immunity standards.

Qualified immunity protects government officials "from liability for civil damages

insofar as their conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known."  *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).

The protection of qualified immunity applies regardless of whether the government official's

---

[1] The claim against Officers Cruse and Mackey appears to be asserted against them only in their individual capacities.  If any official capacity claim was intended, such a claim is redundant of a claim against the City of Topeka and should be dismissed for that reason.  *See Albers v. Jenison*, No. 18-2185-DDC-JPO, 2018 WL 5311862, at *11 (D. Kan. Oct. 26, 2018); *Sims v. Unified Government of Wyandotte County/Kansas City*, 120 F.Supp.2d 938, 944-45 (D. Kan. 2000) ("When a plaintiff names both a municipality and a municipal officer in his official capacity as defendants in an action, the suit against the officer is redundant, confusing, and unnecessary and should be dismissed").

error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Groh v. Ramirez,* 540 U.S. 551, 567 (2004).

Because qualified immunity is "the norm" in private actions against public officials, officials enjoy a presumption of immunity when the defense is raised. *Lewis v. Tripp*, 604 F.3d 1221, 1225 (10th Cir. 2010) (quoting *Harlow*, 457 U.S. at 807); s*ee Kerns v. Bader*, 663 F.3d 1173, 1180 (10th Cir. 2011) ("Law enforcement officers are, of course, entitled to a presumption that they are immune from lawsuits seeking damages for conduct they undertook in the course of performing their jobs.").

A plaintiff overcomes this presumption of immunity "only by carrying the heavy burden of showing both that (1) the defendant-officer in question violated one of his constitutional rights, and (2) the infringed right at issue was clearly established at the time of the allegedly unlawful activity such that 'every reasonable official would have understood that what he was doing' violated the law." *Kerns*, 663 F.3d at 1180 (quoting *Ashcroft v. al–Kidd,* 563 U.S. 731, 131 S.Ct. 2074, 2080, 2083 (2011)).   "Failure on either qualified immunity element is fatal to the plaintiff's cause." *Id.*   The court has discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Provided officers act reasonably in deciding to use deadly force, qualified immunity applies even if the officers were mistaken on the need to use such force. *E.g., Thomson v. Salt Lake County*, 584 F.3d 1304, 1319 (10th Cir. 2009) (noting that a reasonable but mistaken belief regarding the need to use deadly force justifies the use of such deadly force); *Thomas v. Durastanti*, 607 F.3d 655, 666 (10th Cir. 2010) (officer's act of shooting at vehicle reasonable, even if mistaken) (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) and *Sacier v. Katz*, 533

U.S. 194, 206–07 (2009)).  Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law."  *City and County of San Francisco, Calif. v. Sheehan*, __ U.S. __, 135 S. Ct. 1765, 1774 (2015) (internal quotations omitted) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  *Mullenix v. Luna*, __ U.S. __, 136 S. Ct. 305, 308 (2015) (quotation omitted).  To be clearly established, existing caselaw must place a constitutional question beyond debate.  *Id.*; *see also Pauly v. White*, 874 F.3d 1197, 1222 (10th Cir. 2017) (requiring a United States Supreme Court or Tenth Circuit decision on point). The right cannot be defined at high levels of generality, but instead the focus is on "whether the violative nature of particular conduct is clearly established."  *Mullenix*, 136 S. Ct. at 308 (internal emphasis removed) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 741, 131 S. Ct. 2074 (2011)).  The contours of a right must be sufficiently clear so that every "reasonable official would have understood that what he is doing violates that right."  *Al-Kidd*, 563 U.S. at 741 (quotations omitted).

### C.    Application of video and audio evidence.

Two videos from the body worn cameras of Officers Cruse and Mackey provide accurate recordings of their entire encounter with White, including the first aid provided by them before medical personnel arrived.  The Supreme Court eradicated the ability of parties to avoid summary judgment by testimony or other evidence which is blatantly contradicted by video or audio evidence in *Scott v. Harris*, 550 U.S. 372, 127 S. Ct. 1769 (2007).

To assess the constitutionality of officers' actions on a motion for summary judgment, the Court must "view the facts and draw reasonable inference in the light most favorable to" the party opposing summary judgment; "[h]owever, [the Court] cannot ignore clear, contrary video evidence in the record depicting the events as they occurred." *Carabajal v. City of Cheyenne, Wyoming*, 847 F.3d 1203 1207 (10th Cir. 2017) citing *Scott*, 550 U.S. at 380. Where a plaintiff's allegations would otherwise create a fact issue, but for facts depicted in a video recording, it is proper for the Court to rely on what is depicted in the video so as to avoid "visible fiction." *See Scott,* 550 U.S. 372, 380-81 (2007). The District of Kansas recently considered the content of video recordings in deciding a motion to dismiss in *Myers v. Brewer*, No. 1702682, 2018 WL 3145401, at *1 (D. Kan. June 27, 2018). The court observed that:

> It is further well-settled that when a non-moving party's version of the facts are plainly contradicted by video, the court need not view the facts in the light most favorable to the non-moving party . . . To the extent the allegations in plaintiff's complaint are "blatantly contradicted" by the videos, the court has considered the videos instead of the unsupported factual allegations.

*Id.* (internal citations omitted and emphasis added); see also *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013); *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 380 (S.D.N.Y. 2013).

Plaintiff's Complaint (ECF No. 1) alleges that after White was told he was not under arrest, the officers began to grab White's arms in an aggressive manner (¶ 18), that in fear for his safety, White began to run away from the officers (¶ 19), that within a few seconds, each officer fired four shots "without cause or provocation" (¶ 20), and that officers failed to "provide proper aid." (¶ 22). The Complaint acknowledges that White carried a gun but alleges that he "did not brandish the gun or make any motions to reach towards the gun in his pocket at any time." (¶ 24). The video blatantly contradicts these allegations. White was not touched by any officer

until after the gun was seen in his left pocket.  While White likely feared that he would be arrested because he was a convicted felon unlawfully carrying a firearm, the officers' actions in telling him to lay down and then attempting to physically restrain him when he did not, offered White no reason to fear for physical safety.  While White was never successful in drawing the gun, his right hand held his shirt out of the way while his left hand reached for the gun which was visible in his pocket.  (See still images captured from video, Mackey Declaration, Exhibits B and C; Cruse Declaration, Exhibits A and B).

The video demonstrates that White recognized officers' concern with the potential he was armed.  White observed Cruse react to draw a gun when White reached for the bulge in the back of waistband.  Cruse warned White to keep his hands away.   Only seconds later, White necessarily heard Officer Mackey announce that he had a gun but ignored commands to lay down and to stop as he resisted their efforts to control his hands.  Instead, White broke away and ran while reaching toward the gun in his left pocket while his right hand held his shirt out of the way, a move officers are trained to recognize as drawing a weapon.

**D.    Shooting of White was objectively reasonable.**

Fourth Amendment excessive force claims are subject to an objective reasonableness standard as judged by the perspective of a reasonable officer on the scene and not with the 20/20 vision of hindsight.  *Graham v. Connor*, 490 U.S. 386, 396-97 (1989).  "Because 'police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation,' the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective."  *Saucier v. Katz,* 533 U.S. 194, 205 (2001) (quoting *Graham,* 490 U.S. at 397).  Objective reasonableness is based on the totality of the circumstances, and

deference is given to the judgment of reasonable officers on the scene. *Id.* A plaintiff is required to establish that the force used was objectively unreasonable to establish a constitutional violation. *Estate of Larson ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1259 (10th Cir. 2008). The use of deadly force is not unlawful if a reasonable officer would have had probable cause to believe that there was a threat of serious physical harm to himself or others. *Thomas v. Durastanti*, 607 F.3d 655, 664 (10th Cir. 2010) (citing *Graham,* 490 U.S. at 396–97; *Jiron v. City of Lakewood,* 392 F.3d 410, 414–15 (10th Cir. 2004)).

As this Court has noted:

> "Determining whether the force used to affect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Graham v. Connor*, 490 U.S. 386, 396 (1989). The court must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. That an officer made a mistake about the need for force does not decide the question conclusively; rather the situation must be analyzed as a reasonable officer would analyze it in the heat of the moment. *Id*. at 396–97.

> *McHenry v. City of Ottawa, Kansas,* No. 16-2736-DDC-JPO, 2017 WL 4269903, at *6 (D. Kan. Sept. 26, 2017), motion to certify appeal granted, No. 16-2736-DDC-JPO, 2017 WL 4758947 (D. Kan. Oct. 20, 2017).

"But in the end the inquiry is always whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force." *Estate of Larsen*, 511 F.3d 1255, 1260 (10th Cir. 2008) (citing *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995)).

Officers Cruse and Mackey had responded to a call of shots fired in the park to find White and a female as the only individuals in the park. The couple separated upon the approach of the officers, broadcasting to experienced officers an intent to avoid investigation. While

Cruse visited with the female finding no indication that she was armed with a gun, White continued to walk away.  When the officers contacted White, he behaved suspiciously and was ultimately found to be carrying a handgun concealed in his left pants pocket.  White had to be aware that officers would react to any movement of his hand toward that weapon.  Before the gun was seen in White's pocket, Officer Cruse had asked, "You ain't got any guns on you or anything like that, right?"  (Mackey Axon video, 0:01:55; Cruse Axon video, 0:01:20-1:23). Mackey then questioned a suspicious bulge at White's back in the area of his waistband.  When Officer Cruse asked White what he had in his back, White reached toward the bulge, causing Cruse to draw his gun and warn White, "Don't reach for anything." (Mackey Axon video, 0:02:00-2:05; Cruse Axon video, 0:01:28-1:39). White acknowledged, "Sorry, sorry, nothing, it's nothing," while retracting his hands away from his back.  (Cruse Axon video, 0:01:30-1:31). Cruse further cautioned White, "Do me a favor, leave your hands in front of you, straight out." (Mackey Axon video, 0:02:05-2:06; Cruse Axon video, 0:01:31-1:39).  White's compliance with that request confirmed that he recognized the officers' concern with any hand movement toward a weapon.  (Mackey Axon video, 0:02:06-2:09).  White then, with Cruse's approval, cautiously pulled his shirt up from the shoulder area, without reaching near the bulge at his waist, to demonstrate that the bulge was not a weapon.  (Mackey Axon video, 0:02:09-2:13).  Cruse had holstered his gun.  (Mackey Axon video, 0:02:23).

When Officer Mackey then saw and alerted Cruse to White's possession of a gun in his pocket, White was simultaneously alerted that the officers now knew he was armed. (Mackey Axon video, 0:02:21-2:25).   Immediately after stating, "He has a gun in his pocket," Mackey ordered White to "lay down."  (Mackey Axon video, 0:02:22-2:23).  Cruse took White's wrist as White began to resist.  Mackey ordered White to "Stop."  (Mackey Axon video, 0:02:25-2:26).

White broke free and ran, immediately reaching for his left pocket with his left hand. (Mackey Axon video, 0:02:30-2:31). Both officers fired their guns, with all shots occurring within a time span of three seconds or less. (Mackey Axon video, 0:02:32-2:35; Cruse Axon video, 0:01:58-2:01). The encounter with White, from the time he broke free from the officers' grip until the last shot was fired lasted less than five seconds. (Mackey Axon video, 0:02:30-2:35).

All three factors, the severity of the crime at issue, the immediate threat of White to the safety of the officers or others and the resistance to and flight from arrest, when "analyzed as a reasonable officer would analyze it in the heat of the moment," confirm that the use of force was objectively reasonable. After the gun was seen on White, the suspicious character of his actions, including his attempt to deflect the investigation by telling officers that the gun shots came from three blocks away, afforded Officers Cruse and Mackey probable cause to believe that White unlawfully carried a concealed weapon which he had fired several times in the public park in a populated area. Such conduct endangers the public. Carrying a concealed weapon is considered a crime of violence under the Sentencing Guideline. *See United States v. Price,* 132 F. App'x 341, 343 (11th Cir. 2005). Criminal discharge of a firearm ranges from a Class C misdemeanor to a person felony, depending upon where and at what a firearm is discharged. K.S.A. 21 -6308. While the nature of the crime alone would not justify the use of deadly force, the nature of crime contributes to the need for deadly force created by White's actions as analyzed under the second and third factors.

The second factor, the immediate threat White presented to the officers and others, supports the use of deadly force. White not only disregarded the officers' orders and ran, he reached for his gun. Officers are not required to look down the barrel of a gun before deadly force is appropriate. Because action defeats reaction, officers cannot wait for a gun to be drawn

and pointed at them before using deadly force. The decision in *Davis v. McCarter,* 569 F. Supp. 2d 1201 (D. Kan. 2008), provides one judicial determination confirming that shooting a suspect in circumstances similar to those confronted by Officers Cruse and Mackey is reasonable.  The unsupported notion that deadly force can only be used when a suspect can be seen pointing a weapon at a person was dispelled in *Davis.* The Honorable Judge Robinson found "little difficulty in determining that Officer McCarter's use of deadly force to apprehend Davis was justified under the circumstances." *Id*. at 1205.  Officer McCarter had attempted to stop Davis on an outstanding arrest warrant.  When McCarter activated his lights and siren, Davis sped toward a residential neighborhood, drove into an alley and jumped out and ran back towards McCarter's patrol car.  As Davis ran by, McCarter observed Davis retrieve a handgun from his waistband.  McCarter yelled for Davis to stop and drop his gun but Davis kept running. Convinced that Davis was a danger to McCarter's partner and the community, having been "taught that action is faster than reaction," and believing that Davis was attempting to reach cover where he could turn and fire at McCarter and his partner, McCarter fired three shots at Davis with the third striking Davis in the back.  Officers found a handgun 10 to 15 feet from where Davis was lying.  Judge Robinson noted that Davis was already acting with disregard for the community by his traffic violations, was running through a residential neighborhood with a gun, McCarter had been taught that action is faster than reaction and McCarter "was certainly not expected to wait until Davis had actually fired his weapon at him, his partner, or an innocent bystander to take reasonable steps to stop him from doing so" and "[u]nder the circumstances it was reasonable for Officer McCarter to use deadly force to prevent Davis from locating cover and shooting at Officer McCarter and his partner as Officer McCarter suspected he was planning to do." *Ibid*. at 1206-1207.

The analysis in *Thompson v. Hubbard*, 257 F.3d 896 (8th Cir. 2001) also addressed a situation with similarities to the circumstances confronted by Officers Cruse and Mackey.  An officer responded to a report of shots fired during an armed robbery. The suspects had fled.  The officer approached a man (Thompson) who fit the description of one of the suspects who was in an area where the officer believed the suspects might be.  Thompson fled and the officer pursued on foot.  Thompson ran between two buildings and climbed over a short fence.  As he stood up after landing on the ground, Thompson "looked over his shoulder at [the officer], and moved his arms as though reaching for a weapon at waist level." *Id.* at 898. Thompson's back remained towards the officer, who could not see Thompson's hands. The officer "yelled, 'stop,' and when Thompson's arms continued to move, he fired a single shot into Thompson's back," killing him. *Id.*  No weapon was found on Thompson's body.  The court concluded that the officer had probable cause to believe that the fleeing suspect posed a threat of serious physical harm, and therefore the use of deadly force was objectively reasonable.  The court noted that "[a]n officer is not constitutionally required to wait until he sets eyes upon the weapon before employing deadly force to protect himself against a fleeing suspect who turns and moves as though to draw a gun." *Id.*  Officers Cruse and Mackey were also responding to a shots fired call but unlike the situation in *Thompson*, had also seen the gun in White's pocket.  White had already been warned to lie down, to keep his hands away from any weapon and to stop before a shot was fired by either officer. Dominique White also looked over his shoulder as he was reaching for his gun.  See Mackey Declaration, Exhibit B.

Although hindsight demonstrates that White never successfully drew his gun, the decision of Officers Cruse and Mackey to use deadly force must be evaluated from their perspective in the seconds in which the need for use of force unfolded.  In *Mullins v. Cyranek*,

805 F.3d 760, 767-68 (6th Cir. 2015),  the court concluded that "'[w]hile hindsight reveals that

[the suspect] was no longer a threat when he was shot,' officers should not be denied qualified

immunity 'in situations where they are faced with a threat of severe injury or death and must

make split-second decisions, albeit ultimately mistaken decisions, about the amount of force

necessary to subdue such a threat.'" *Mullins*, 805 F.3d at 767–68 *as quoted in Rush v. City of*

*Lansing*, 644 Fed. Appx. 415, 421–24 (6th Cir. 2016).  The *Mullins* court collected cases from

various circuits that hold that officer reaction times of a few seconds do not undermine qualified

immunity, as follows:

> *Untalan [v. City of Lorain],* 430 F.3d [312, 315-16 (6th Cir. 2005)] (finding police
> officer's use of deadly force reasonable where only a "few seconds" passed
> between when assailant lost control of knife and when officer shot assailant); *see
> also Troupe v. Sarasota County,* 419 F.3d 1160, 1168 (11th Cir.2005) (finding that
> 3–5 seconds was a short enough time for the use of deadly force to stop someone
> who previously endangered police and bystanders even if, in hindsight, the facts
> show that members of the S.W.A.T. Team could have escaped unharmed);
> *Robinson v. Arrugueta,* 415 F.3d 1252, 1256 (11th Cir.2005) (holding that an
> Officer's decision to shoot within a reaction time of 2.72 seconds was reasonable,
> even if hindsight showed that the officer could have escaped unharmed); *Pace v.
> Capobianco,* 283 F.3d 1275, 1282 (11th Cir.2002) (justifying use of deadly force
> in the "very few seconds" after a serious threat had subsided); *McLenagan v.
> Karnes,* 27 F.3d 1002, 1007–08 (4th Cir.1994) (justifying the use of deadly force
> against an unarmed, handcuffed suspect when an officer reasonably believed that
> a fellow officer had seen a gun in the suspect's hands, in large part because the
> officer "had no time to consider anything at all").  (*Id.* at 767.)

> *See also Boyd v. Baeppler*, 215 F.3d 594, 602–04 (6th Cir. 2000) (holding officer

protected by qualified immunity where he shot the decedent seven times even after the decedent

had been brought down by another officer's shot).

In *Moody v. City of Newport News, Virginia,* 193 F. Supp. 3d 530, 549 (E.D. Va. 2016),

aff'd sub nom. *Moody v. Hollandsworth*, 690 F. App'x 140 (4th Cir. 2017), one officer shot at a

suspect in a car struggling with another officer when she observed his hand move toward the

floorboard.  She knew of a prior gun possession by the suspect, "feared that Plaintiff was

reaching for a firearm" and "should Plaintiff succeed in any attempt to pick up a firearm, [the other officer] was in danger of serious harm." *Ibid.* at 549. "Thus, even though [the officer] was mistaken in her belief that Plaintiff had a firearm . . . [she] had sound reasons for her perception that Plaintiff posed an immediate threat to [the other officer's] safety at the time she shot." *Ibid.*

In *Reece v. Anderson,* 926 F.2d 494 (5th Cir. 1991), the court held that an officer was justified in using deadly force where, after pursuing bank robbery suspects in high speed chase, the passenger repeatedly reached below the officer's line of sight in defiance of orders to raise his hands, and the officer could reasonably have believed that the passenger had retrieved a gun and was about to shoot. In *Billingsley v. City of Omaha,* 277 F.3d 990, 995 (8th Cir. 2002), the court exonerated an officer who shot an unarmed suspect because "probable cause for the use of deadly force is satisfied by the immediate threat of death or serious bodily harm, as observed through the Fourth Amendment prism of objective reasonableness," when the immediate threat of death or serious bodily harm resulted from the officer's inability to observe the suspects hand and shoulder movement. The court stated that "[a]lthough Billingsley was found to be unarmed, a police officer can still employ deadly force if objectively reasonable." *Id.* (citations omitted).

Because White was known to be armed with a concealed gun, was reasonably believed to have already shot the gun, had disregarded orders to lay down and instead broke from officers and reached for his gun while holding his shirt out of the way in a classic drawing motion, the second factor supports the reasonableness of the use of deadly force under the circumstances. A reasonable officer in the position of defendants would perceive an immediate threat to themselves and others by the conduct of White.

The third factor, resistance to and flight from arrest, also supports the use of force when "analyzed as a reasonable officer would analyze it in the heat of the moment." White

necessarily heard Officer Mackey announce that he had a gun in his pocket.  He was told to lay

down but began to resist.  He was told to stop but continued to resist, successfully breaking from

the grip of both officers, then ran.  White both resisted physically and fled from arrest,

supporting the use of deadly force.

Even if there were a mistake as to the need to use force, "a mistaken understanding of the

facts that is reasonable under the circumstances can render a seizure reasonable under the 4th

Amendment."  *Milstead v. Kibler,* 243 F.3d 157, 165 (4th Cir. 2001).  In *Thomas v. Durastanti,*

607 F.3d 655, 666 (10th Cir. 2010), the Tenth Circuit noted that the officer's "reasonable

perceptions are what matters, he had mere seconds to react, and his actions in firing the first

couple of shots were reasonable, even if mistaken.  An officer may be found to have acted

reasonably even if he has a mistaken belief as to the facts establishing the existence of exigent

circumstances."  *Id.* at 666 (citations omitted).   And in *Estate of Larson*, the court noted that

where police officers were "forced to make split second judgments," even if the officers'

"assessment of their threat was mistaken, it was not objectively unreasonable."  511 F.3d at

1260-61.  *See also Thomson,* 584 F.3d at 1315 ("[A] reasonable but mistaken belief that the

suspect is likely to fight back justifies using more force than is actually needed.").

Whether the use of deadly force by Officers Cruse and Mackey was objectively

reasonable is question of law.  Once the Court has determined "the relevant set of facts and

drawn all inferences in favor of the nonmoving party to the extent supportable by the record,"

whether the suspect's action warranted the use of deadly force "is a pure question of law."  *Scott*

*v. Harris,* 550 U.S. 372, 381, fn. 8, 127 S. Ct. 1769, 1776 (2007).

Viewed from the perspective of a reasonable officer on the scene without the benefit of

hindsight, the shooting of Dominique White was objectively reasonable.

**E.      Officers did not violate a clearly-established right in shooting White.**

Even if a fact issue were presented whether the use of deadly force by Officers Cruse and Mackey was objectively reasonable, plaintiff's claims should still be dismissed because no sufficiently analogous precedent clearly established that their actions would violate the Fourth Amendment.  Qualified immunity precludes the second-guessing of the split-second decision making of the reasonable officers in the field.  No United States Supreme Court or Tenth Circuit decisions clearly establish that the use of force in this situation was unconstitutional as required to defeat qualified immunity.  *See Pauly*, 874 F.3d at 1222.

Where an "officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others," it is not constitutionally unreasonable to use deadly force." *Brosseau v. Haugen*, 543 U.S. 194, 197-98, 125 S.Ct. 596, 598 (2004) quoting *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S.Ct. 694 (1985).  Because no Fourth Amendment right of White was violated, the Court need not address the second prong of the qualified immunity analysis – whether the officers violated a clearly-established constitutional right.  But even if plaintiff satisfied the first prong, Officers Cruse and Mackey are entitled to summary judgment based on the second prong addressing whether all reasonable officers would know that the use of force violated clearly established law under the circumstances presented.

In recent years, the Supreme Court has emphasized the importance of this analysis, reversing Tenth Circuit and other Circuit decisions that failed to properly adhere to this requirement:

> In the last five years, this Court has issued a number of opinions reversing federal courts in qualified immunity cases. See, *e.g., City and County of San Francisco v. Sheehan,* 575 U.S. ——, ——, n. 3, 135 S.Ct. 1765, 1774, n. 3, 191 L.Ed.2d 856 (2015) (collecting cases). The Court has found this necessary both because qualified immunity is important to " 'society as a whole,' " *ibid.,* and because as " 'an immunity from suit,' " qualified immunity " 'is effectively lost if a case is

erroneously permitted to go to trial,' " *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

Today, it is again necessary to reiterate the longstanding principle that "clearly established law" should not be defined "at a high level of generality." *Ashcroft v. al–Kidd,* 563 U.S. 731, 742, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011). As this Court explained decades ago, the clearly established law must be "particularized" to the facts of the case. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Otherwise, "[p]laintiffs would be able to convert the rule of qualified immunity ... into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id.,* at 639, 107 S.Ct. 3034.

*White v. Pauly,* __ U.S. __, 137 S.Ct. 548, 551-552 (2017)

In *White,* the Court criticized reliance on cases which "lay out excessive-force principles at only a general level" and reconfirmed the requirement that plaintiff "identify a case where an officer acting under similar circumstances as Officer White was held to have violated the Fourth Amendment." *Ibid.* at 552.  The Circuit's recognition that the case "present[ed] a unique set of facts and circumstances . . . alone should have been an important indication to the majority that White's conduct did not violate a 'clearly established' right." *Ibid.*

By asserting the qualified immunity defense, defendants trigger the "well-settled twofold burden" that plaintiff is "compelled to shoulder: not only" must plaintiff rebut defendant's "no-constitutional-violation arguments, but [he] also had to demonstrate that any constitutional violation was grounded in then-extant clearly established law." *Cox v. Glanz,* 800 F.3d 1231, 1245 (10th Cir. 2015).  As *White v. Pauly* reminds, that "clearly established law" must be involve "a case where an officer acting under similar circumstances as [defendant] was held to have violated the Fourth Amendment."  Further, that law must be a "Supreme Court or Tenth Circuit decision on point or the clear weight of authority from other jurisdictions."  *Medina v. City and County of Denver,* 960 F.2d 1493, 1498 (10th Cir. 1992).

Plaintiff cannot leap this hurdle.  In the qualified immunity context, the issue presented is whether a reasonable officer could have found probable cause to believe that White presented a threat of serious injury at the time of an officer's decision to fire his gun.  Where the event unfolds in such a way that a reasonable police officer could have believed that the suspect presented an imminent risk of serious injury, the use of deadly force is justified.

Plaintiff cannot produce the required Supreme Court or Tenth Circuit case in which an officer is found to have violated the Fourth Amendment rights of a suspect whom officers had probable cause to believe had an unlawfully concealed gun, had just fired a gun in a public area, who ignored orders to get on the ground and to stop as he resisted the officers and who ran from the officers while moving in a manner that replicated drawing of the gun from a known location.

To the contrary, precedent demonstrates that an officer is objectively reasonable in using deadly force based on a reasonable perception that a suspect was drawing a weapon, even when the suspect was later learned to be unarmed.   For example, in *Slattery v. Rizzo*, 939 F.2d 213 (4th Cir. 1991), the court concluded that an officer was entitled to qualified immunity after the officer shot an unarmed suspect in the face.  Officer Rizzo was one of several officers involved in a drug sting operation.  Two individuals drove into a parking lot where the driver exited to conduct a drug transaction.  Officer Rizzo approached the passenger who remained in the car.  Rizzo shined a flashlight through the window but could not see the passenger's hands.  He ordered him to raise his hands.  When he failed to respond, Officer Rizzo kicked out the car window, opened the car door and yelled "police officer...get your hands up now."  The passenger's left hand could not be seen clearly but appeared to be partially closed around an object.  When the passenger turned his upper body towards Rizzo, who still could not see the passenger's left hand, Rizzo believed that he was coming at him with a weapon and shot him once in the face.  The

object in his hand was later determined to be a beer bottle.  The Fourth Circuit noted that "the purpose of qualified immunity is to remove most civil liability actions, except those where the official clearly broke the law, from the legal process well in advance of the submission of facts to a jury.  A police officer should prevail on an assertion of qualified immunity if a reasonable officer possessing the same information could have believed that his conduct was lawful.  If a reasonable officer could have found probable cause to believe that [the passenger] presented a serious threat of personal harm at the time that Rizzo pulled the trigger, then as a matter of law, [Rizzo] is entitled to qualified immunity."  *Ibid*. at 216 (internal citations omitted).

Officers Cruse and Mackey were not mistaken.  Dominique White had a gun, which they had probable cause to believe he had recently fired.  He fought them rather than going to ground as ordered.  He continued to resist their efforts to control him by hand despite being ordered to "stop."  He had just been warned not to reach for anything yet he reached with his left hand for the gun in his left pocket, even using his right hand to hold his shirt out of the way so that his left hand could access the gun.  White continued to run but could have shot the gun backwards, turned and fired the gun or reached cover and fired.  He had already been warned to stop.

Other cases also confirm that Officers Mackey and Cruse are entitled to qualified immunity.  *See Herington v. City of Wichita*, No. 6:14-CV-01094-JTM, 2017 WL 76930 (D. Kan. Jan. 9, 2017) (Officer who shot suspect with a bag which the officer mistakenly believed contained a gun was entitled to qualified immunity); *Estate of Smart v. City of Wichita,* No. 14-2111-JPO, 2018 WL 3744063 (D. Kan. Aug. 7, 2018) (Officers did not violate clearly established law when "plaintiffs have not directed the court to any factually similar case (let alone one from the Supreme Court or Tenth Circuit that was issued before [the date of the shooting]) that would clearly indicate the actions taken by [the officers] would constitute

excessive force" even though fact issues existed whether officers misidentified Smart as the active shooter whom they shot while not pointing a gun at anyone as he ran away. *Id.* at *18); *Jackson v. City of Wichita, Kansas*, No. CV 13-1376-KHV, 2017 WL 106838, at *14 (D. Kan. Jan. 11, 2017) (Although fact issues existed whether officers' shooting of female suspect approaching them with a knife was objectively reasonable, officers were immune when plaintiff failed to present factually similar precedent to make it "sufficiently clear that 'every reasonable officer' would have understood that what he is doing violates that right." *Id.* at *13).

When plaintiff fails to carry the burden of identifying a Tenth Circuit or U.S. Supreme Court case in which an officer was found to have violated the Fourth Amendment rights of a suspect under similar circumstances, Officers Cruse and Mackey are entitled to summary judgment.

### F.   Officers did not violate any duty to provide medical care.

The allegation that Officers did not provide medical care is disproved by the video. Within a minute of the shooting, emergency medical care was summoned.  Officer Cruse secured first aid supplies and promptly began to administer first aide to White.  Neither officer is a trained medical professional treatment.

Officers have no duty to provide professional medical aid.  *See Wilson v. Meeks*, 52 F.3d 1547, 1556 (10th Cir. 1995) *abrogated on other grounds by Saucier v. Katz*, 533 U.S. 194, 205, 121 S.Ct. 2151 (2001).  Whether officers have a duty to render first aid is less clear. *See Id.* at 1555-1557.  At a minimum, a plaintiff must establish deliberate indifference to support a claim of failure to provide medical attention to a pretrial detainee. *Id. See also Barrie v. Grand County, Utah*, 119 F.3d 862, 867 (10th Cir. 1997) (pretrial detainee's inadequate medical attention claim must be judged against deliberate indifference to serious medical needs).

Officers Cruse and Mackey promptly summoned professional medical treatment, provided first aid in the interim and were not deliberately indifferent to providing care to White. Plainly, they violated no clearly establish right to medical care.

## CONCLUSION

Officers Cruse and Mackey encountered a suspect who was armed with a concealed handgun, who was reasonably believed to have shot the gun a short time earlier, who plainly was aware of officers' concern about a weapon yet, once aware the officers had seen his gun, disregarded orders to get on the ground and stop resisting, and instead broke away and moved to draw the gun, holding his shirt out of the way and reaching toward the gun.  The totality of the circumstances presented an immediate threat of serious bodily harm or death to the officers and others justifying the use of deadly force in the few seconds in which the officers had to react. Officers Cruse and Mackey are entitled to qualified immunity from plaintiffs' claims.

Respectfully submitted,

/s/ J. Steven Pigg
J. Steven Pigg                                      #09213
David R. Cooper                                     #16690
FISHER, PATTERSON, SAYLER & SMITH, L.L.P.
3550 S.W. 5th St.
Topeka, KS  66606
(785) 232-7761 / (785) 232-6604 – fax
E-mail:  spigg@fisherpatterson.com
            dcooper@fisherpatterson.com
**Attorneys for Defendants**
**Michael Cruse and Justin Mackey**

## CERTIFICATE OF SERVICE

I hereby certify that on December 28, 2018, I electronically filed the foregoing with the

clerk of the court by using the CM/ECF system which will send a notice of electronic filing to

the following:

Rick E. Bailey
CONLEE, SCHMIDT & EMERSON, LLP
200 W. Douglas, Suite 300
Wichita, KS 67202
rbailey@fcse.net
**Attorney for Plaintiff**

Andrew M. Stroth
Carlton Odim
ACTION INJURY LAW GROUP, LLC
191 North Wacker Drive
Chicago, IL 60606
astroth@actioninjurylawgroup.com
carlton@actioninjurylawgroup.com
***Pro Hac Vice* Attorneys for Plaintiff**

Mary R. (Shelly) Starr
Chief of Litigation
Nicholas H. Jefferson
Assistant City Attorney
CITY OF TOPEKA
Legal Department
215 S.E. 7th St., Room 353
Topeka, KS 66603
sstarr@topeka.org
njefferson@topeka.org
**Attorneys for Defendant City of Topeka**

I further certify that I mailed the foregoing document and the notice of electronic filing

by first-class mail to the following non-CM/ECF participants:  No one.

/s/ J. Steven Pigg
J. Steven Pigg