# EXHIBIT A
# CRUSE DEPOSITION EXCERPTS

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

KELLY WHITE, Individually, as             )
Co-Administrator of the Estate            )
of Dominique White, deceased,             )
and MARY THERESA WYNNE,                   )
Individually, as                          )
Co-Administrator of the Estate            )
of Dominique White, deceased,             )
and as Next Friend of minor               )
grandchildren TUW, JSW, JKW,              )
NCW,                                      )
                                          )
                Plaintiffs,               )
                                          )
          vs.                             ) Case No.
                                          ) 5:18-CV-04050-DDC-JPO
CITY OF TOPEKA, KANSAS;                   )
TOPEKA POLICE OFFICERS MICHAEL            )
CRUSE, OFFICER JUSTIN MACKEY              )
and JOHN DOE OFFICERS 1-5,                )
                                          )
                Defendants.               )
                                          )

DEPOSITION

The videotape deposition of MICHAEL CRUSE taken on behalf of the Plaintiffs pursuant to the Federal Rules of Civil Procedure before:
    RICK J. FLORES, CSR
    KELLEY REPORTING ASSOCIATES, LTD.
    515 South Main, Suite 108
    Wichita, Kansas 67202

a Certified Shorthand Reporter of Kansas, at 3550 S.W. 5th Street, Topeka, Shawnee County, Kansas, on the 8th day of August, 2019, at 11:07 a.m.

Page 2

APPEARANCES

PLAINTIFFS:
    CONLEE SCHMIDT & EMERSON, LLP
    Mr. Rick E. Bailey
    Suite 300
    200 West Douglas
    Wichita, KS 67202
    (316) 264-3300
    Fax: (316) 264-3423
    rbailey@fcse.net

DEFENDANT CITY OF TOPEKA, KANSAS:
    CITY ATTORNEY'S OFFICE
    Ms. Shelly Starr
    Mr. Nicholas Jefferson
    215 SE 7th Street, Room 353
    Topeka, KS 66603
    (785) 368-3883
    Fax: (785) 368-3901
    sstarr@topeka.org

DEFENDANTS MICHAEL CRUSE and JUSTIN MACKEY:
    FISHER PATTERSON SAYLER & SMITH, LLP
    Mr. J. Steven Pigg
    Mr. David Cooper
    3550 S.W. 5th Street
    Topeka, KS 66606
    (785) 232-7761
    Fax: (785) 232-6604
    spigg@fisherpatterson.com

VIDEOGRAPHER:
    Advanced Document Imaging
    Mr. Michael Miles
    515 S. Main, Suite 108
    Wichita, KS 67202
    (316) 267-8200
    Fax: (316) 267-9382
    video@kelleyreporting.com

Also present was Mr. Justin Mackey and Ms. Mary Theresa Wynne.

Page 3

INDEX

MICHAEL CRUSE
    Direct Examination by Mr. Bailey:        4
    Cross-Examination by Mr. Pigg:         104
    Cross-Examination by Ms. Starr:        110
    Redirect Examination by Mr. Bailey:    111
    Recross-Examination by Mr. Pigg:       116

Cruse Exhibits
    No. 1 - Declaration of Michael Cruse    17
            (7 pgs)

    No. 2 - Google Maps Photo of Incident   42
            Area w/Markings (1 pg)

(EXHIBITS BOUND IN SEPARATE EXHIBIT NOTEBOOK)

SIGNATURE OF WITNESS                       118
CERTIFICATE                                119

Page 4

                VIDEOGRAPHER: This begins the
        videotape deposition of Michael Cruse. Today
        is August 8th, 2019, and the time is 11:07
        a.m.
                Will the court reporter please swear
        in the witness.
                MICHAEL CRUSE
        having been first duly sworn on his oath to
        state the truth, the whole truth, and nothing
        but the truth, testifies as follows:
                DIRECT EXAMINATION
        BY MR. BAILEY:
        Q.  Could you state your name for the record,
        please.
        A.  Michael Cruse.
        Q.  And how are you currently employed?
        A.  With the City of Topeka, Topeka Police
        Department.
        Q.  And what's your position there?
        A.  Officer.
        Q.  Have you ever had your deposition taken
        before?
        A.  No.
        Q.  I know you've had the opportunity to talk
        with your lawyers about what a deposition is

Page 65

1    A. Because there was a gun on the scene, he had
2       lied about having the gun, and that I wanted
3       to control the situation so that nobody would
4       get hurt.
5    Q. And when you say control the situation, you
6       mean you wanted to physically control
7       Dominique?
8    A. Yes.
9    Q. Were there other --
10   A. Can I --
11   Q. Yes, please.
12   A. -- step back? I wouldn't say physically
13      control. It's physically prevent him from
14      creating a dangerous situation.
15   Q. Did you give any commands to Dominique at
16      this time?
17   A. I cannot recall if I said stop or -- I can't
18      recall.
19   Q. So not sure from your perspective what
20      Officer Mackey is doing on the other side,
21      but you're reaching out and grabbing at
22      Dominique's right hand?
23   A. Yes.
24   Q. Did you use both hands to do that or one
25      hand?

Page 66

1    A. Both hands.
2    Q. And again, why were you grabbing at his hand?
3    A. To control his actions from becoming
4       combative towards Mackey, who was wanting to
5       secure a gun.
6    Q. I'm trying to understand why you chose to use
7       physical methods to restrain Dominique rather
8       than staying back and asking him to get on
9       his knees or take some other posture?
10   A. I had stated that upon Officer Mackey stating
11      he had a gun, I observed a lot of tension or
12      action -- can't find the correct word --
13      displayed in his shoulders, and it was clear
14      that he was getting upset.
15   Q. And your response to him getting upset was to
16      attempt to grab one of his arms?
17   A. The reason I attempted to grab one of his
18      arms 'cause Officer Mackey was -- my
19      understanding was attempting to secure his
20      side from a firearm being obtained.
21   Q. Had Dominique made any gestures or motions
22      towards a firearm up to this point?
23   A. Not until Officer Mackey had pointed it out.
24   Q. What gestures towards a firearm had Dominique
25      made after that?

Page 67

1    A. To prevent Officer Mackey from obtaining the
2       firearm, I believe.
3    Q. Did Officer Mackey indicate to you where the
4       firearm was?
5    A. He said he's got a firearm in his pocket.
6    Q. Did he tell you which pocket?
7    A. Well, I was on the right side and he was on
8       the left side, so I would believe it was the
9       left pocket. And he was wearing fairly
10      baggy -- like I said, I don't know if they're
11      pants or shorts, but they appeared to be
12      baggy.
13   Q. So we're at the point where you're grabbing
14      Dominique's right arm with both your hands?
15   A. Yes.
16   Q. Where on his arm were you grabbing him?
17   A. Forearm.
18   Q. Could you see what Officer Mackey was doing
19      to try and restrain Dominique?
20   A. No, I couldn't. The fact that his left arm
21      didn't come around, I believed in my mind
22      that Mackey had the left arm.
23   Q. Other than perhaps giving the command "stop",
24      you don't recall giving any other commands to
25      Dominique?

Page 68

1    A. Not that I recollect.
2    Q. I believe you said your intent was you were
3       wanting to take Dominique to the ground?
4    A. Yes.
5    Q. To control the situation?
6    A. Yes.
7    Q. How, in your mind, did you envision doing
8       that?
9    A. I had released my right hand from his forearm
10      and made an attempt to grab his head and
11      control his head down to the ground.
12   Q. And how did he respond to that?
13   A. He broke free from my grip and my hand missed
14      his head.
15   Q. When you say broke free, did he simply pull
16      away from you?
17   A. He forcibly put away [sic].
18   Q. During this --
19   A. He was -- I do remember he was very sweaty or
20      clammy to the touch.
21   Q. During this -- would you describe it as a
22      struggle with Dominique?
23      How would you describe it?
24   A. Yeah, resistance, struggle, yes.
25   Q. During that struggle with Dominique, did he

316.267.8200
WICHITA, KANSAS
67202

Page 69

1 ever punch or attempt to punch you?
2 A. Not that I remember.
3 Q. Did you see him attempt to punch or punch
4    Officer Mackey?
5 A. No.
6 Q. Did he attempt to kick you?
7 A. Not that I remember.
8 Q. You see him attempt to kick Officer Mackey?
9 A. Not that I remember, no. I didn't see any of
10   that in his motions.
11 Q. Did you see him attempt to head butt you?
12 A. No.
13 Q. Or head butt Officer Mackey?
14 A. Didn't see that, no.
15 Q. How about biting at your hand or arm?
16 A. No.
17 Q. Or biting at Officer Mackey?
18 A. No.
19 Q. Any spitting that went on?
20 A. No.
21 Q. Did he make any verbal threats to you during
22   this struggle?
23 A. No.
24 Q. How about any verbal threats to Officer
25   Mackey?

Page 70

1 A. Not that I heard.
2 Q. Did he say anything that you considered to be
3    confrontational or aggressive during the
4    struggle?
5 A. Not that I can recall.
6 Q. Either towards you or towards Officer Mackey?
7 A. Not that I can recall, no.
8 Q. During this struggle, did you consider the
9    use of any nonlethal or less lethal force to
10   try and restrain Dominique?
11 A. I hadn't -- I didn't have that availability
12   at that time.
13 Q. What do you mean you didn't have the
14   availability?
15 A. My hands were on his deal, and I was using
16   what we call empty hand techniques and -- to
17   place him to the ground.
18      MR. PIGG: Let's take a break.
19 See what's up here.
20      MR. BAILEY: Let's take a break.
21      VIDEOGRAPHER: Off the record at
22 12:57.
23      (A recess was taken from 12:57 p.m. to
24 1:10 p.m.)
25      VIDEOGRAPHER: Back on the record

Page 71

1 at 1:10.
2 BY MR. BAILEY:
3 Q. I believe when we took the break for the
4    knock at the door, the question pending was
5    why did you step towards Dominique when
6    Officer Mackey said he had a gun?
7 A. I had answered that with I observed his
8    shoulders tense up, which led me to believe
9    he was struggling on his left side with
10   Mackey, and I went to grab his right arm
11   where I obtained it.
12 Q. Did you consider, rather than stepping
13   forward and grabbing his arm, using either
14   the baton or the pepper spray that you had at
15   your disposal?
16 A. I think -- I didn't consider that at the
17   time. I just made the decision to use empty
18   hand techniques in an attempt to just
19   peace -- or as controllably get him to the
20   ground where we could control the movements.
21 Q. Prior to this point, during your interaction
22   with him face to face, my understanding was
23   he'd been compliant with your requests?
24 A. Aside from not stopping when being instructed
25   to stop, yes, he appeared to be so.

Page 72

1 Q. Right. He had not complied with the request
2    that you had made over the PA system of your
3    vehicle, but once you'd stepped out of the --
4    your car and started interacting with him
5    face to face, he'd been compliant with you?
6 A. Yes.
7 Q. He'd been nonthreatening?
8 A. I didn't observe any threats.
9 Q. He hadn't been aggressive or hostile towards
10   you?
11 A. Not that I could tell.
12 Q. Did you have any reason to believe at that
13   point in time that he was a threat to you?
14      MR. PIGG: At what point in time?
15      MR. BAILEY: Anytime prior to him
16 breaking away.
17 A. I didn't believe he was a threat, but I was
18   cautious as I typically am.
19 BY MR. BAILEY:
20 Q. Did you believe that prior to him breaking
21   away from you that he served as a threat to
22   Officer Mackey?
23 A. Yes.
24 Q. Describe that.
25 A. Officer Mackey stated he had a firearm. I

Page 73

1  didn't know from my vantage point if he was
2  trying to obtain that firearm or what was
3  occurring. I knew that there was some
4  physical tension as a result of what was
5  displayed on my -- to my view.
6  Q. Prior to the time you and Officer Mackey shot
7     Dominique in the back, did you ever see the
8     firearm?
9           MR. PIGG: Object to form;
10  misstates the evidence.
11  BY MR. BAILEY:
12  Q. You can answer.
13          MR. PIGG: Read back the
14  question, please.
15          (The requested portion of the record
16  was read by the reporter, as follows:
17  Question: "Prior to the time you and Officer
18  Mackey shot Dominique in the back, do you
19  ever see the firearm?")
20          MR. PIGG: Answer prior to the
21  time any shot was fired, did you ever see a
22  firearm.
23  A. No, I did not see the firearm.
24  BY MR. BAILEY:
25  Q. Prior to the time that Dominique broke away

Page 74

1     from you and Officer Mackey, did you see
2     Dominique make what you interpreted to be
3     some type of grab or gesture towards where
4     you believe the firearm was?
5  A. Prior to the time of him breaking away?
6  Q. Yes.
7  A. I do not know. What I did observe and heard
8     was Mackey state he had a firearm. Mackey
9     appeared to be gaining or attempting to gain
10    control in that area of the left side, when I
11    observed the tension, and then I grabbed his
12    arm.
13  Q. I don't think that was my question again.
14       Can you read back the question.
15          (The requested portion of the record
16  was read by the reporter, as follows:
17  Question: "Prior to the time that Dominique
18  broke away from you and Officer Mackey, did
19  you see Dominique make what you interpreted
20  to be some type of grab or gesture towards
21  where you believe the firearm was?")
22  A. I did not visually observe that. What I did
23    visually observe was what appeared to be a
24    struggle on his left side. He may have been
25    going for it. I'm not sure if Mackey was

Page 75

1     attempting to gain control if he was going
2     for it.
3        Does that make sense?
4  Q. In other words, you can speculate whether he
5     was or wasn't, but you didn't observe it?
6           MR. PIGG: Object to form of the
7  question.
8  BY MR. BAILEY:
9  Q. You can answer.
10          MR. PIGG: Answer.
11  A. Can you ask the question again.
12  Q. Yeah. We can speculate as to what may have
13     occurred, but you didn't see any motions
14     towards Dominique's gun?
15          MR. PIGG: Object to the form of
16  the question.
17  BY MR. BAILEY:
18  Q. You can answer.
19          MR. PIGG: You can answer.
20  There's two parts to the question.
21  A. What's the first part of the question?
22          MR. PIGG: He's adding
23  commentary. So if you just say yes or no,
24  you're accepting his commentary. So you need
25  to parse out the question.

Page 76

1  A. Based on my training and experience, there
2     was a concern of the potential danger of him
3     obtaining that firearm with what I observed
4     in Mackey's attempt to gain control of his
5     left hand.
6  Q. As far as you knew, at that point in time
7     when the struggle with Dominique started, was
8     it legal for Dominique to carry a firearm?
9  A. Yes.
10  Q. Had he made any threats or gestures of --
11     that you interpreted as a threat towards you
12     or Officer Mackey at that point in time?
13  A. Prior to the detection of the firearm?
14  Q. Prior to the struggle starting.
15  A. No.
16  Q. Why did you feel it was necessary to control
17     Dominique once you learned he had a firearm
18     if it was legal for him to carry one?
19  A. He had lied about having a -- not having a
20     firearm on his person. We were there as a
21     result of shots being fired in the park.
22     There was an expression of a dispute between
23     him and the girlfriend. He had exhibited
24     physical signs of what appeared to be,
25     initially, as not feeling well. And he made

Page 73

1  didn't know from my vantage point if he was
2  trying to obtain that firearm or what was
3  occurring. I knew that there was some
4  physical tension as a result of what was
5  displayed on my -- to my view.
6  Q. Prior to the time you and Officer Mackey shot
7     Dominique in the back, did you ever see the
8     firearm?
9         MR. PIGG: Object to form;
10  misstates the evidence.
11  BY MR. BAILEY:
12  Q. You can answer.
13         MR. PIGG: Read back the
14  question, please.
15         (The requested portion of the record
16  was read by the reporter, as follows:
17  Question: "Prior to the time you and Officer
18  Mackey shot Dominique in the back, do you
19  ever see the firearm?")
20         MR. PIGG: Answer prior to the
21  time any shot was fired, did you ever see a
22  firearm.
23  A. No, I did not see the firearm.
24  BY MR. BAILEY:
25  Q. Prior to the time that Dominique broke away

Page 74

1  from you and Officer Mackey, did you see
2  Dominique make what you interpreted to be
3  some type of grab or gesture towards where
4  you believe the firearm was?
5  A. Prior to the time of him breaking away?
6  Q. Yes.
7  A. I do not know. What I did observe and heard
8     was Mackey state he had a firearm. Mackey
9     appeared to be gaining or attempting to gain
10    control in that area of the left side, when I
11    observed the tension, and then I grabbed his
12    arm.
13  Q. I don't think that was my question again.
14    Can you read back the question.
15         (The requested portion of the record
16  was read by the reporter, as follows:
17  Question: "Prior to the time that Dominique
18  broke away from you and Officer Mackey, did
19  you see Dominique make what you interpreted
20  to be some type of grab or gesture towards
21  where you believe the firearm was?")
22  A. I did not visually observe that. What I did
23    visually observe was what appeared to be a
24    struggle on his left side. He may have been
25    going for it. I'm not sure if Mackey was

Page 75

1  attempting to gain control if he was going
2  for it.
3      Does that make sense?
4  Q. In other words, you can speculate whether he
5     was or wasn't, but you didn't observe it?
6         MR. PIGG: Object to form of the
7  question.
8  BY MR. BAILEY:
9  Q. You can answer.
10         MR. PIGG: Answer.
11  A. Can you ask the question again.
12  Q. Yeah. We can speculate as to what may have
13    occurred, but you didn't see any motions
14    towards Dominique's gun?
15         MR. PIGG: Object to the form of
16  the question.
17  BY MR. BAILEY:
18  Q. You can answer.
19         MR. PIGG: You can answer.
20  There's two parts to the question.
21  A. What's the first part of the question?
22         MR. PIGG: He's adding
23  commentary. So if you just say yes or no,
24  you're accepting his commentary. So you need
25  to parse out the question.

Page 76

1  A. Based on my training and experience, there
2     was a concern of the potential danger of him
3     obtaining that firearm with what I observed
4     in Mackey's attempt to gain control of his
5     left hand.
6  Q. As far as you knew, at that point in time
7     when the struggle with Dominique started, was
8     it legal for Dominique to carry a firearm?
9  A. Yes.
10  Q. Had he made any threats or gestures of --
11    that you interpreted as a threat towards you
12    or Officer Mackey at that point in time?
13  A. Prior to the detection of the firearm?
14  Q. Prior to the struggle starting.
15  A. No.
16  Q. Why did you feel it was necessary to control
17    Dominique once you learned he had a firearm
18    if it was legal for him to carry one?
19  A. He had lied about having a -- not having a
20    firearm on his person. We were there as a
21    result of shots being fired in the park.
22    There was an expression of a dispute between
23    him and the girlfriend. He had exhibited
24    physical signs of what appeared to be,
25    initially, as not feeling well. And he made

Page 97

1  Q.  So you don't recall drawing it before the
2      gesture, and it sounds like from your
3      testimony, you really don't specifically
4      recall drawing it at all; is that fair?
5  A.  I remember my handgun raising up and seeing
6      the sights.
7  Q.  Did you observe anything about Dominique and
8      his behavior from the time you pulled your
9      firearm until you started pulling the
10     trigger?
11 A.  Aside from reaching for the pocket, no.
12 Q.  Well, he had reached for the pocket and then
13     you drew the gun?
14 A.  Yes.
15 Q.  My question is once you started drawing the
16     gun, were you looking to Dominique to
17     perceive whether the threat was continuing or
18     the threat had ended, or, at that point were
19     you on automatic pilot, so to speak: You're
20     pulling and you're shooting?
21 A.  I remember looking at his hand going towards
22     the pocket. It didn't appear to be a fluid
23     motion of going forward, and at that point, I
24     used deadly force.
25 Q.  At that point you made the decision to shoot

Page 98

1      at him, and if I'm understanding you, you
2      don't really recall the specifics of when you
3      pulled, drew your weapon and what Dominique
4      was doing at the time you started pulling the
5      trigger; is that fair?
6  A.  Yeah.
7  Q.  Do you know how many shots Officer Mackey
8      took?
9  A.  No, not specifically.
10 Q.  Did you see any indication that any of the
11     shots either that you had taken or that
12     Officer Mackey had taken had struck Dominique
13     between the time you started shooting and
14     then when you came up on him?
15 A.  No.
16 Q.  You saw no changes in his posture or jerking
17     or movement or --
18 A.  No.
19 Q.  -- anything like that?
20          MR. PIGG: Let him get his whole
21     question out.
22 A.  I'm sorry.
23 Q.  At the time Dominique broke away from you and
24     Officer Mackey, did you have reason to
25     believe that he had committed any crime at

Page 99

1      that point?
2  A.  There was the possibility, yes.
3  Q.  And what was the possible crime that he might
4      have committed?
5  A.  At the minimum, discharging a firearm in the
6      city limits.
7  Q.  And why do you say at the minimum?
8  A.  Well, I hadn't been back to the scene of
9      where he was, so I couldn't say what was over
10     there.
11 Q.  Do you have any reason to believe that it was
12     anything more than simply discharging a
13     firearm?
14 A.  Initially, at that time, I hadn't completed
15     any investigatory or investigation of the
16     situation. Like I said, my initial with the
17     call of shots being fired, having contact
18     with him, lying about the gun, so forth, most
19     likely but not definitely, he had fired shots
20     in the park.
21 Q.  And based upon all of the information that
22     you had at the time, that was the most
23     serious crime that you believed he might have
24     committed?
25 A.  Up until what point?

Page 100

1  Q.  Up until the point he spun away from you and
2      made the gesture towards his pocket.
3  A.  Okay. So not including the spin away and the
4      gesture towards his pocket; correct?
5  Q.  Let's include that.
6  A.  Okay. It would have been interference with a
7      law enforcement officer. And since I did
8      feel in fear of my life, I would say threat
9      with -- based on his physical action of
10     reaching for the gun.
11 Q.  And what had you seen him do that made you
12     believe he might have committed interference
13     with a law enforcement officer?
14 A.  He lied about having the gun. He resisted
15     Officer Mackey's attempt to secure the gun.
16     And he resisted our attempts to detain him to
17     the ground.
18 Q.  So he told a lie, and he struggled with you
19     and Officer Mackey when you attempted to
20     restrain him?
21 A.  Yes.
22 Q.  Did it bother you that Dominique had
23     initially refused to comply with your orders
24     to stop, the commands that you gave over the
25     PA system?

Page 109

1  to go towards the center mass of his body
2  with my sights. And we are trained to focus
3  primarily on the front side of our pistol
4  before we engage.
5  Q. And when you do that, is that a two -- you're
6     holding the gun with two hands?
7  A. Yes.
8  Q. And so you're raising that up and your arm
9     and hand blocks your view of his lower body?
10 A. Yes.
11 Q. When he reached for the gun, did you consider
12    that an aggravated assault on a law
13    enforcement officer?
14        MR. BAILEY: Object to the form
15    of the question.
16 Q. And I'm -- let me ask it a different way:
17    Thinking about it now, when he reached for
18    the gun, is that aggravated assault of a law
19    enforcement officer in your mind?
20 A. Yes.
21        MR. BAILEY: Same objection.
22 A. Sorry.
23 BY MR. PIGG:
24 Q. And all those things that we've just
25    discussed and the other things you've

Page 110

1  discussed during your deposition were things
2  you had in your mind and knew about prior to
3  the time you pull the trigger?
4  A. Yes.
5        MR. BAILEY: Object to the form
6    of the question.
7        MR. PIGG: I don't have any other
8    questions at this time.
9            CROSS-EXAMINATION
10 BY MS. STARR:
11 Q. I do have a question.
12    Officer Cruse, you've mentioned this
13    several times and you've said that when
14    you -- when you spoke with the female, that
15    she didn't blade you or -- could you explain
16    that term for us.
17 A. I'm sorry for the use of that jargon. She
18    didn't place her in a -- her body position in
19    a manner that would conceal either side
20    intentionally.
21 Q. So when you say someone's blading you, does
22    that mean they're turning to like so you
23    can't see --
24 A. If you were standing facing me and I did this
25    (demonstrating), I'm blading you 'cause I

Page 111

1  could be concealing something over here.
2  Q. I see.
3        MR. PIGG: And for those who
4    aren't watching the video and just reading
5    the transcript, you show that you turn to the
6    side.
7  A. Yes, I turned to the side.
8        MS. STARR: I have no other
9    questions.
10           REDIRECT EXAMINATION
11 BY MR. BAILEY:
12 Q. I want to followup on a couple of things that
13    Mr. Pigg asked you about. Asked you about
14    the statement that you gave that I believe
15    was January 1st, 2018, to Deputy Chief
16    Wheeles.
17    Am I pronouncing that right?
18 A. I think he talked to me about Lieutenant
19    Sturgeon, but Wheeles did interview me, yes.
20 Q. That was in -- sometime in January of 2018;
21    correct?
22 A. Sometime in that area, yes.
23 Q. And the shooting of Dominique White was in
24    September of 2017?
25 A. Yes.

Page 112

1  Q. Between September and January, had you given
2     any statements or made any reports to the
3     Topeka Police Department about the shooting
4     incident?
5  A. I'm not sure when I talked to PSU. I think I
6     talked to PSU after that. I'm not completely
7     positive.
8  Q. What is PSU?
9  A. Professional Standards Unit. It's what TV
10    shows would call like internal affairs or
11    something. I don't ever recall making an
12    official statement or a production of a
13    statement.
14 Q. Did you fill out any reports of any kind
15    concerning the shooting between when it
16    occurred in September of 2017 and this
17    interview in January of 2018?
18 A. I don't believe so.
19 Q. Did you talk to anyone, whether it was
20    Officer Mackey or anyone else, about the
21    shooting between the time of the shooting and
22    the time of your statement in January?
23 A. I've talked with an attorney I had, Tom
24    Lemon. I've -- I don't know if I've talked
25    to you yet. I've talked with Father Riley,

Page 113

1  priest. I've talked with my spouse and
2  Officer Mackey.
3  Q. And had you reviewed any of the body cam
4  footage between the time of the shooting of
5  Dominique White and the time you gave the
6  statements in January?
7  A. I don't believe in its entirety, no. I'm --
8  I'm -- entirety, I don't believe so.
9  Q. So what Mr. Pigg was asking you the statement
10  you gave in January of 2018, if there are
11  more details in it then than you remember
12  now, that would probably be more accurate
13  than your memory today, my question is that
14  statement was some four months after the
15  shooting; is that right?
16  A. It appears so, yes.
17  Q. And in that four months, you had made no
18  other reports or statements that would
19  capture your memory of what happened closer
20  to the event than January?
21  A. In that four months, I don't recall any
22  instance regarding that.
23  Q. So by the time you gave the statement in
24  January, you'd had the opportunity to think
25  about what had occurred, talk to Father

Page 114

1  Riley, talk to a lawyer, talk to Officer
2  Mackey, and then give a statement about your
3  memory of what transpired.
4  Do I have that accurate?
5  A. During that four months or approximate four
6  months prior to the statement given, I
7  believe that's what I said, yes.
8  Q. And Mr. Pigg was asking you about this
9  comment that -- or the command that Officer
10  Mackey gave to lay down, and you hadn't
11  mentioned that when I'd asked you some
12  questions so I want to followup on that.
13  When, in the sequence of events, do
14  you recall Officer Mackey making that
15  command?
16  A. My memory was jogged. He made that statement
17  as soon as he made contact with what I
18  believe he made contact with the left side of
19  Mr. White.
20  Q. When you say made contact, you mean
21  physically --
22  A. Yes.
23  Q. -- touched? So at the time you remember
24  Officer Mackey saying "lay down," he had a
25  hold of the left arm of Dominique White as

Page 115

1  best you know?
2  A. I believe he did.
3  Q. Was that before or after you had grabbed the
4  right arm of Dominique White?
5  A. That was before I had made contact,
6  physically, with Dominique.
7  Q. So to get the sequence right: Officer Mackey
8  grabs his left arm, says "lay down", and then
9  you grab Dominique's right arm.
10  Do I have that sequence correct?
11  A. The sequence you mentioned appears to be
12  correct.
13  Q. And other than that single command to lay
14  down that was issued before you had grabbed
15  Dominique's right arm, were there any other
16  commands that either you gave Dominique or
17  that Officer Mackey gave Dominique?
18  A. I don't recollect the commands that I may
19  have given. I do remember continuing to hear
20  "stop," but -- yeah, "don't" or "stop",
21  something like that.
22  Q. And was that given by Officer Mackey or was
23  that from Dominique White?
24  A. I believe that statement was given by Mackey.
25  MR. BAILEY: I believe that's all

Page 116

1  the further questions I have at this time.
2  RECROSS-EXAMINATION
3  BY MR. PIGG:
4  Q. Do you recall either from being there or from
5  watching the AXON video that after Officer
6  Mackey said, "he's got a gun in his pocket,
7  lay down, he's got a gun in his pocket," that
8  White said that "that's not a gun, man"?
9  A. I don't recall Mr. White making that
10  statement.
11  MR. PIGG: Okay. Nothing
12  further.
13  MS. STARR: No other questions.
14  MR. BAILEY: Officer, you'll have
15  an opportunity to review a transcript of the
16  deposition after it's prepared. You'll have
17  30 days in which you can go through it, and
18  if there are any changes that you need to
19  make, there will be a form for you to make
20  those changes and return it to the court
21  reporter. And I'm sure your lawyers can give
22  you more details on that process.
23  THE WITNESS: Okay. So I'll also
24  be able to watch the video of the -- and
25  compare it to the --

29 (Pages 113 to 116)