IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

**KELLY WHITE, individually, as
Co-Administrator of the Estate of
Dominique T. White, deceased, and
as Next Friend of minor grandchildren
TUW, JSW, JKW, NCW, and
MARY THERESA WYNNE, as
Co-Administrator of the Estate of
Dominique T. White,**

     **Plaintiffs,**

**v.**

**CITY OF TOPEKA, MICHAEL CRUSE,
JUSTIN MACKEY, and JOHN DOE
OFFICERS #1-5,**

     **Defendants.**

**Case No. 18-4050-DDC-JPO**

<u>**MEMORANDUM AND ORDER**</u>

   This is a particularly difficult case.  It stems from a police encounter with an armed

individual that ended in a tragic way.  On September 28, 2017, Topeka (Kansas) Police Officers

shot and killed Dominique T. White.  Shortly before the shooting, two Topeka police officers

responded to a call reporting several gunshots in the area near Ripley Park in Topeka.  When the

officers arrived at the park, they encountered Mr. White walking away from the park.  During a

brief discussion with Mr. White, one officer saw that Mr. White had a firearm in his left pocket.

He ordered Mr. White to lie down and stop.  Mr. White ignored these orders.  Instead, he resisted

as the officers attempted to grab his arms and secure the firearm.  Then, Mr. White broke free

from the officers' grip and began to run away.  Immediately as Mr. White broke free, the officers

drew their guns and began firing at Mr. White as he fled.  Their bullets hit Mr. White, and he died from the gunshots.

It's not hard to imagine other ways this police encounter might have ended.  But that's not the narrow task assigned to the court.  Instead, the court is duty-bound to apply the controlling legal principles established by the Supreme Court and Tenth Circuit.  Specifically, the two officers' Motion for Summary Judgment invokes the doctrine of qualified immunity. They assert that the doctrine protects them from plaintiffs' claims, which rely on 42 U.S.C. § 1983.  Plaintiffs claim that the two officers used excessive force and thereby denied Mr. White recognized constitutional rights.

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (citations and internal quotation marks omitted).  The Supreme Court has described the qualified immunity doctrine as protecting "'all but the plainly incompetent or those who knowingly violate the law.'" *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  And, our Circuit has explained, federal courts apply this doctrine "in order that officers might not be unduly 'inhibit[ed] . . . in performing their official duties.'" *Wilson v. City of Layfette*, 510 F. App'x 775, 780 (10th Cir. 2013) (quoting *Medina v. Cram*, 252 F.3d 1124, 1127 (10th Cir. 2001)).

In recent years, many judicial officers have criticized qualified immunity.  For example, Justice Thomas repeatedly has expressed his "strong doubts about [the Supreme Court's] § 1983 qualified immunity doctrine." *Baxter v. Bracey*, 140 S. Ct. 1862, 1865 (2020) (Thomas, J., dissenting from denial of certiorari); *see also id.* at 1862, 1864 (recognizing that "[t]he text of §

1983 makes no mention of defenses or immunities[,]" and finding "no basis for the objective inquiry into clearly established law that our modern cases prescribe" (citation, internal quotations, and alternations omitted)); *Ziglar*, 137 S. Ct. at 1870, 1872 (Thomas, J., concurring in part and concurring in the judgment) (noting a "growing concern with [the Supreme Court's] qualified immunity jurisprudence," criticizing the Court for "continu[ing] to substitute [its] own policy preferences for the mandates of Congress," and urging the Court to "reconsider [its] qualified immunity jurisprudence" "[i]n an appropriate case").

Recently, several federal district court judges have levied strong criticism of the qualified immunity doctrine because of the way it immunizes police officers for their actions.  *See Jamison v. McClendon*, __ F. Supp. 3d __, No. 3:16-CV-595-CWR-LRA, 2020 WL 4497723, at *2 (S.D. Miss. Aug. 4, 2020) (describing qualified immunity as an "invented . . . legal doctrine to protect law enforcement officers from having to face any consequences for wrongdoing" and provide "a shield for these officers, protecting them from accountability"); *see also id.* at *29 (describing qualified immunity doctrine as "extraordinary and unsustainable" and urging the Supreme Court to "eliminate the doctrine"); *Peterson v. Martinez*, No. 3:19-cv-01447-WHO, 2020 WL 4673953, at *5 n.5 (N.D. Cal. Aug. 12, 2020) (referring to the *Jamison* opinion as an "excellent opinion . . . describing the unhappy development of qualified immunity jurisprudence").  And, just this month, another district court judge embraced Justice Thomas's view and opined that "qualified immunity jurisprudence is due for a major overhaul."  *Briscoe v. City of Seattle*, No. C18-262 TSZ, 2020 WL 5203588, at *6 (W.D. Wash. Sept. 1, 2020).

This dialogue, however, can't displace the court's current job in this case.  The court "is required to apply the law" governing qualified immunity "as stated by the Supreme Court." *Jamison*, 2020 WL 4497723, at *3; *see also Rodriguez de Quijas v. Shearson/Am. Express, Inc.*,

490 U.S. 477, 484 (1989) (holding that Courts of Appeal must follow "directly control[ing]" Supreme Court precedent because only the Supreme Court has "the prerogative of overruling its own decisions"). So, within these strictures imposed by the qualified immunity doctrine, the court must determine whether the two officers violated Mr. White's *clearly established* constitutional right against use of excessive force.

This summary judgment order reaches two primary conclusions.

*First*, based on the summary judgment facts, the court holds that a reasonable jury could conclude that the totality of the circumstances do not support probable cause to believe Mr. White committed severe crimes or that he posed a threat of serious physical harm to the officers or others. And so, under these facts, a genuine issue exists whether the officers' use of force was unjustified.[1]

*Second*, and again applying the summary judgment facts, the court nonetheless holds that qualified immunity applies. It reaches this conclusion because plaintiffs have failed to identify a "clearly established right" that the officers violated. In other words, plaintiffs have identified no clearly established Supreme Court or Tenth Circuit case that prohibited use of deadly force against an individual who was carrying a firearm in his pocket, had ignored officers' commands to lie down and stop, had resisted officers' attempts to secure his firearm, and then fled from officers with the gun still in his possession. Likewise, the court's independent research has located no such case. This second conclusion requires the court to grant summary judgment on plaintiffs' claim against the two officers.

---

[1] The Supreme Court has explained how courts must decide qualified immunity on summary judgment: "[O]nce [the court has] determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record, the reasonableness of [the officer's] actions . . . is a pure question of law." *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007).

Finally, a procedural explanation about an important phrase used repeatedly throughout this Order—"the summary judgment facts." This phrase recognizes that the court—at this stage of the case—must view conflicts in the evidence in the light most favorable to plaintiffs. To say it differently, when deciding the current motion, the court can't weigh the evidence or decide the truth of the matter. Instead, the court simply must review the evidence submitted by the parties and determine whether it presents a genuine factual conflict. When it does so, the court must accept plaintiffs' version of the evidence.

Below, after briefly describing the case's procedural background, the court identifies the controlling summary judgment facts. The Order then presents the court's analysis and explains the reasons for its two conclusions.

## I.      Background

The two co-administrators of the Estate of Dominique T. White filed this lawsuit. Mr. White's father, plaintiff Kelly White, brings this action individually as a co-administrator of the Estate of Dominique T. White, and as Next Friend for his minor grandchildren. Doc. 43 at 7 (First Am. Compl. ¶ 41). Also, plaintiff Mary Theresa Wynne brings this action as co-administrator of the Estate of Dominique T. White. *Id.* The court refers to Kelly White and Mary Theresa Wynne collectively as "plaintiffs."[2]

Plaintiffs have sued the City of Topeka and Topeka Police Officers Michael Cruse, Justin Mackey, and five John Does under 42 U.S.C. § 1983. Plaintiffs assert two § 1983 claims: (1) Count 1 asserts a § 1983 claim against the individual officer defendants for excessive force violating Mr. White's right against unreasonable seizures under the Fourth Amendment to the United States Constitution and his right to due process under the Fourteenth Amendment to the

---

[2]      As defined above, this Order's references to "Mr. White" are to the decedent, Dominique T. White, not plaintiff Kelly White.

United States Constitution; and (2) Count 2 asserts a § 1983 *Monell* claim against the City of Topeka for inadequate training.  Doc. 43 at 5–7 (First Am. Compl. ¶¶ 27–41).

This matter comes before the court on defendants Michael Cruse and Justin Mackey's Motion for Summary Judgment (Doc. 51).  Officers Cruse and Mackey ask the court to enter summary judgment against Count 1's § 1983 claim for several reasons, including qualified immunity.  *Id.*  Plaintiffs have filed a Response opposing the officers' summary judgment motion (Doc. 58).  And, the officers have filed a Reply (Doc. 61).  For reasons explained below, the court grants the Motion for Summary Judgment.

## II.     Uncontroverted Facts

The following facts are either uncontroverted, or, where genuinely controverted, are viewed in the light most favorable to the party opposing summary judgment.  *Scott v. Harris*, 550 U.S. 372, 378–80 (2007).

On September 28, 2017, Topeka Police Officers Cruse and Mackey responded to a call of several gunshots in the area of Ripley Park in Topeka, Kansas.  Doc. 52-2 at 2 (Cruse Decl. ¶ 2); Doc. 52-3 at 2 (Mackey Decl. ¶ 2).  Officers Cruse and Mackey are familiar with the area around Ripley Park and describe it as a "high crime area" known as a location where gangs congregate.[3] Doc. 52-2 at 2 (Cruse Decl. ¶ 3); Doc. 52-3 at 2 (Mackey Decl. ¶ 4).

---

[3]     Plaintiffs controvert the facts asserted in this paragraph, arguing that they are self-serving and not supported by any objective evidence.  *See Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991) (explaining that "conclusory and self-serving affidavits are not sufficient" summary judgment evidence but instead "affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence").  Here, Officers Cruse and Mackey's descriptions of the call they answered on September 28, 2017, and the area around Ripley Park are summary judgment facts because the facts are based on their personal knowledge and describe something they personally observed during their work as Topeka Police Officers.  *See* Doc. 52-2 at 6 (declaring that the "foregoing information" in Officer Cruse's Declaration "is based upon [his] personal knowledge" and "is true and correct"); Doc. 52-3 at 3 (declaring that the "foregoing information" in Officer Mackey's Declaration "is based upon [his] personal knowledge" and "is true and correct").

Officers Cruse and Mackey separately drove marked Topeka Police vehicles to Ripley Park.  Doc. 52-2 at 2 (Cruse Decl. ¶ 4); Doc. 52-3 at 2 (Mackey Decl. ¶ 3).  Officer Cruse arrived first.  Doc. 52-2 at 2 (Cruse Decl. ¶ 5); Doc. 52-5 at 4 (Cruse Dep. 42:16–45:7).  Officer Cruse stopped his vehicle on a street near the northwest corner of the park to wait for another officer to arrive.  *Id.*  While waiting, he observed two individuals—a man and a woman—near a bench in the park.  *Id.*

As Officer Mackey arrived, Officer Cruse began to drive his vehicle toward the two individuals in the park.  Doc. 52-2 at 2 (Cruse Decl. ¶ 6).  As Officer Cruse's vehicle approached, the two individuals separated and began walking in different directions.  *Id.*  Officer Cruse testified that he considered the individuals' actions as an attempt to divide the officers or elude them.  *Id.*  Officer Cruse then used the public address system in his patrol vehicle to address the individuals, ordering them to stop walking away.  *Id.*  Both individuals ignored the order and continued walking in separate directions.  *Id.*

Officer Cruse made contact with the woman.  *Id.* at 2 (Cruse Decl. ¶ 7).  He asked her what was going on and why the man was ignoring his order to stop.  *Id.*  She responded that she and the man just had an argument.  *Id.* at 2–3 (Cruse Decl. ¶ 7).  But, Officer Cruse observed, the woman didn't appear upset.  *Id.* at 3 (Cruse Decl. ¶ 7).  He found that unusual based on his experience responding to calls involving domestic disputes.  *Id.*  Officer Cruse observed no

---

As our Circuit has recognized, "virtually any party's testimony can be considered 'self-serving[.]'"  *Greer v. City of Wichita, Kan.*, 943 F.3d 1320, 1325 (10th Cir. 2019).  Nevertheless, self-serving testimony is "competent" evidence to establish summary judgment facts.  *Id.* (citing *Sanchez v. Vilsack*, 695 F.3d 1174, 1180 n.4 (10th Cir. 2012)); *see also Sanchez*, 695 F.3d at 1180 n.4 ("So long as an affidavit is 'based upon personal knowledge and set[s] forth facts that would be admissible in evidence,' it is legally competent to oppose summary judgment, irrespective of its self-serving nature." (quoting *Hall*, 935 F.2d at 1111)).  So, the court concludes, the facts asserted in this paragraph, supported by Officers Cruse and Mackey's Declarations, constitute competent evidence for use during the summary judgment process.  The court thus considers these facts in its summary judgment analysis.

bulges on the woman that might suggest she was carrying a weapon.  *Id.*  And he didn't see the woman make any movements to suggest she was attempting to conceal a weapon.  *Id.*  Officer Cruse never got out of his vehicle to talk with the woman.  Doc. 52-5 at 5 (Cruse Dep. 48:7–15). He estimates that his conversation with the woman lasted 10 to 15 seconds.  *Id.* at 6 (Cruse Dep. 52:6–9).

Officer Cruse informed Officer Mackey by radio that the man was ignoring him, and he asked Officer Mackey to stop him.  Ex. 9 (Mackey Axon video 0:00:17–21).[4]  Officer Mackey drove his vehicle toward the man—who later was identified as Mr. White.  *Id.* (Mackey Axon video 0:00:25–34).  Officer Mackey used his vehicle's public address system to address Mr. White.  *Id.* (Mackey Axon video 0:00:35–37).  He said:  "Hey man, just hold up.  I have to ask you a question."  *Id.*  Mr. White continued walking away from Officer Mackey.  *Id.* (Mackey Axon video 0:00:38–45).  Officer Mackey again announced:  "Hey man, I was going to ask you a really fast question."  *Id.* (Mackey Axon video 0:00:44–48).  About 15 to 20 seconds after Officer Mackey first asked Mr. White to stop, Mr. White stopped walking away.  Doc. 52-6 at 5 (Mackey Dep. 37:21–23).

Both Officer Cruse and Officer Mackey approached Mr. White in their vehicles as Mr. White neared a street.  *Id.* (Mackey Axon video 0:00:48–58).  Then, both officers stepped out of their police cars.  Doc. 52-5 at 7 (Cruse Dep. 54:18–55:3); Doc. 52-6 at 6 (Mackey Dep. 39:17–19, 40:20–41:8).  Officer Mackey testified that he didn't recognize Mr. White or know anything about him.  Doc. 52-6 at 6 (Mackey Dep. 41:21–25).  Officer Cruse said to Mr. White:  "Hey, how are you doing?"  Ex. 9 (Mackey Axon video 0:00:55–1:02).  Officer Cruse then said:

---

[4]     Defendants filed Exhibit 9 conventionally.  *See* Doc. 55 (describing the exhibits defendants filed conventionally to support their summary judgment motion as "1 CD containing Exhibits 8, 9, and 10").

"We're only here because we are checking out a gunshot call, okay?"  *Id.* (Mackey Axon video 0:01:05–1:10).

As the officers approached Mr. White on foot, Mr. White bent over from a standing position at the waist so that his back was parallel to the ground.  *Id.* (Mackey Axon video 0:01:05–1:10); Doc. 52-5 at 7 (Cruse Dep. 56:12–57:4); Doc. 52-6 at 7 (Mackey Dep. 42:23–43:7).  Officer Cruse asked Mr. White:  "So why are you ignoring me?"  Ex. 10 (Cruse Axon video 0:00:38–41).  Mr. White responded to Officer Cruse while he still was in a bent over position, but the video doesn't capture the substance of his response.  *Id.* (Cruse Axon video 0:00:41–44).  Officer Cruse said, "Okay, I can understand that, but I have nothing to do with you and your chick.  I have everything to do with you guys' safety and the community's safety."  *Id.* (Cruse Axon video 0:00:45–52).

The officers then discussed with Mr. White whether he had heard gunshots and about the location of the sounds of gunfire.  *Id.* (Cruse Axon video 0:00:45–1:05).  Officer Cruse began to move away from Mr. White and asked him, "You gonna be okay?  Do you need an ambulance or anything?"  Ex. 9 (Mackey Axon video 0:01:43–46); Ex. 10 (Cruse Axon video 0:01:06–1:15).  Mr. White said something in response that, again, is not audible on the video.  *Id.*  Officer Cruse then asked, "Why do we scare you?"  Ex. 10 (Cruse Axon video 0:01:16–1:20).  Mr. White's response isn't audible on the video.  *Id.*  Officer Cruse asked Mr. White, "You ain't got any guns on you or anything like that, right?"  *Id.* (Cruse Axon video 0:01:20–1:23).  When he asked this question, Officer Cruse was standing to the right side of Mr. White.  *Id.*  At the same time, Officer Mackey began to move around behind Mr. White.  *Id.*; *see also* Doc. 52-6 at 7 (Mackey Dep. 44:18–45:5) (describing how Officer Mackey stood at Mr. White's right rear shoulder and started walking clockwise around him).  Mr. White said something in response that is not audible

on the video.  Ex. 10 (Cruse Axon video 0:01:16–1:25).  Standing several feet behind Mr. White, Officer Mackey brought to Officer Cruse's attention a bulge on Mr. White's rear waistband area under his t-shirt.  *Id.*  Officer Mackey did so by pointing at Mr. White's back and his own back. *Id.*

Officer Cruse asked Mr. White:  "What've you got in your back?"  *Id.* (Cruse Axon video 0:01:25–1:29).  Mr. White reached toward the bulge in his back, and Officer Cruse drew his gun. Ex. 9 (Mackey Axon video 0:02:00–2:05); Ex. 10 (Cruse Axon video 0:01:28–1:39).  Officer Cruse warned Mr. White:  "Don't reach for anything."  *Id.*  Mr. White apologized, saying "Sorry, sorry, nothing, it's nothing" while retracting his hand away from his back.  Ex. 10 (Cruse Axon video 0:01:30–1:31).  Officer Cruse told Mr. White:  "Do me a favor, leave your hands in front of you, straight out."  *Id.* (Cruse Axon video 0:01:31–1:39).  Mr. White complied with the command, stretching his arms straight out from his head while leaving his body in the bent-over position with his back parallel to the ground.  *Id.* (Cruse Axon video 0:01:33–1:40).  So, in this position, Mr. White's arms now were stretched out from his body parallel with the ground.  *Id.* (Cruse Axon video 0:01:33–1:40).  Officer Cruse then holstered his gun.  Doc. 52-5 at 8 (Mackey Dep. 59:20–60:24); Ex. 9 (Mackey Axon video 0:02:23).

Officer Mackey's deposition testimony explained that when Mr. White reached backwards, his t-shirt lifted and revealed that he was wearing a belt that produced a bulge in his back.  Doc. 52-6 at 8 (Mackey Dep. 46:5–10).  Officer Mackey also noticed Mr. White's left front pocket in his pants was open.  *Id.* (Mackey Dep. 47:21–48:18).  He moved closer to Mr. White, looked inside the pocket, and saw a black semi-automatic handgun and a loaded magazine.  *Id.*  When Officer Mackey made this observation, Mr. White still was in the bent-over position.  *Id.*  Officer Mackey moved closer to Mr. White's left and began to check his left side.

Ex. 9 (Mackey Axon video 0:02:10–2:25); Ex. 10 (Cruse Axon video 0:01:36–1:50).  Mr. White

told Officer Mackey not to do that, and he said, "You have no reason to arrest me, bro."  *Id.*

Officer Mackey said, "Relax," and then announced to Officer Cruse, "He has a gun in his

pocket."  Ex. 10 (Cruse Axon video 0:01:36–1:50).  Officer Mackey ordered Mr. White to "lay

down," and again said, "He has a gun in his pocket."  *Id.*  Mr. White denied having a gun.  Doc.

52-6 at 9 (Mackey Dep. 52:13–18).

Officer Cruse then grabbed Mr. White's right wrist with both hands.  Ex. 10 (Cruse Axon

video 0:01:50–1:53).  Officer Mackey tried to hold on to Mr. White's left arm, and he ordered

Mr. White to "stop."  Ex. 9 (Mackey Axon video 0:02:25–2:26).  Mr. White didn't comply with

the officers' commands to lie down.  Doc. 52-6 at 13 (Mackey Dep. 75:2–14).  Mr. White

resisted Officer Mackey's attempts to prevent Mr. White from reaching for his pocket and then

resisted the officers' attempts to detain him.  *Id.*  Mr. White then broke free from the officers and

ran.  Doc. 52-5 at 10 (Cruse Dep. 80:9–25); Doc. 52-6 at 10 (Mackey Dep. 54:3–19); Doc. 52-8

at 35–Doc. 52-12 at 11 (Axon video frames 4253–4442 (breaking free) and frames 4461–4593

(running)).

Right after Mr. White broke free, both officers removed their weapons from their

holsters.  Doc. 52-6 at 12 (Mackey Dep. 62:18–63:1); Doc. 52-10 at 60–64 (Axon video frame

4460–64).  As Mr. White broke free, his body rotated to his left and toward Officer Mackey.

Doc. 52-10 at 61 (Axon video frame 4461).  As Mr. White began to run away, his left hand

moved near his left hip.  *Id.* at 63–79 (Axon video frames 4463–79).  At the same time, Mr.

White's right arm swung around in front of his body, to his left side, and tapped or slapped his

left side.  *Id.* at 63–65 (Axon video frames 4463–65).  Then, Mr. White slightly turned his face to

his left side, toward Officer Mackey.  *Id.* at 73–78 (Axon video frames 4473–78).  He took about

two-and-a-half steps with his left hand on his left hip.  *Id.* at 69–87 (Axon video frames 4469–87).

As Mr. White ran away, with his left arm near his left hip, Office Cruse raised his weapon.  *Id.* at 63–79 (Axon video frames 4463–4479).  Officer Cruse fired his weapon first.  Doc. 52-6 at 12 (Mackey Dep. 63:14–15); Doc. 52-4 at 8 (Bauer Dep. 52:16–22); Doc. 52-10 at 87 (Axon video frame 4487).  Officer Cruse aimed his weapon at "center mass" or the "large portion of the body."  Doc. 52-5 at 11 (Cruse Dep. 84:7–10).  Officer Mackey fired his weapon next.  Doc. 52-4 at 11 (Bauer Dep. 62:14–19); Doc. 52-11 at 7 (Axon video frame 4498).  Officer Mackey fired his weapon five times while focusing his attention on his weapon's sights.  Doc. 52-6 at 12 (Mackey Dep. 63:16–23).  Officer Mackey's shots grazed the front of Mr. White's chest, and he believes the shot to Mr. White's back came from his gun.  *Id.* (Mackey Dep. 63:24–64:3).  Neither Officer Cruse nor Officer Mackey gave any verbal warnings after Mr. White broke free from the officers' grip and before the officers stopped shooting.  Doc. 58-3 at 4 (Mackey Dep. 66:6–19).  Officer Cruse testified that he never saw a firearm in Mr. White's possession anytime before the officers shot him.  Doc. 58-2 at 6 (Cruse Dep. 73:6–23).

Two-tenths of a second after Officer Cruse's first shot, Mr. White moved his hand away from his left hip.  Doc. 52-11 at 1 (Axon video frame 4492).[5]  About two tenths of a second after Mr. White moved his left hand away from his left hip, Officer Mackey fired his first shot.  Doc.

---

[5]      Each frame of the video in Docs. 52-8 to 52-13 represents about 0.034 seconds.  Doc. 52-4 at 5 (Bauer Dep. 32:1–12).  So, to calculate the time between different frames, one must multiply the number of frames by 0.034 seconds.  *Id.* (Bauer Dep. 32:13–22).  Officer Cruse's first shot occurs in frame 4487, and Mr. White first moves his hand away from his left hip in frame 4492.  Doc. 52-10 at 87 (Axon video frame 4487); Doc. 52-11 at 1 (Axon video frame 4492).  So, the time that elapses between frame 4487 and 4492 is five frames multiplied by 0.034 seconds, or 0.17 seconds.  This interval is less than two-tenths of a second.

52-11 at 7 (Axon video frame 4498).[6]  Some 1.8 seconds after Officer Cruse fired his first shot,

Officer Cruse fired the last shot at Mr. White.  Doc. 52-4 at 11–12 (Bauer Dep. 64:13–65:15);

Doc. 52-11 at 48 (Axon video frame 4539).[7]  Three and three-tenths seconds elapsed between

Mr. White's breaking free from the officers' grip until the officers fired the last shot.  Doc. 52-10

at 42–Doc. 52-11 at 48 (Axon video frames 4442–4539).[8]

     Less than a minute after the officers fired their weapons, Officer Cruse requested

emergency medical response.  Ex. 10 (Cruse Axon video 0:2:39–40).  Officer Cruse then went to

his patrol vehicle and retrieved medical supplies.  *Id.* (Cruse Axon video 0:03:06–3:40).  Officer

Cruse took the medical supplies to Mr. White and administered first aid until other officers

arrived on the scene and took over Mr. White's medical treatment.  *Id.* (Cruse Axon video

0:03:43–6:42); Ex. 9 (Mackey Axon video 0:04:25–7:10).  Officer Mackey asked Officer Cruse

what he could do to help him.  Ex. 9 (Mackey Axon video 0:05:42).  Before beginning first aid,

Officer Cruse removed the gun and additional magazines from Mr. White's left pocket.  Ex. 10

(Cruse Axon video 0:04:05–4:10).

## III.   Summary Judgment Standard

     The standard for deciding summary judgment under Federal Rule of Civil Procedure 56

is well-known.  Summary judgment is appropriate if the moving party demonstrates that "no

genuine dispute" exists about "any material fact" and that it is "entitled to a judgment as a matter

---

[6]     The court calculates the time between frame 4492 (when Mr. White moved his left hand away from his hip) to frame 4498 (when Officer Mackey first fired his weapon) as six frames multiplied by 0.034 seconds, or 0.204 seconds.  *See supra* note 5.

[7]     The court calculates the time between frame 4487 (when Officer Cruse first fired his weapon) to frame 4539 (when Officer Cruse fired the last shot) as 52 frames multiplied by 0.034 seconds, or 1.768 seconds.  *See supra* note 5.

[8]     The court calculates the time between frame 4442 (when Mr. White broke free from the officers' grip) to frame 4539 (when Officer Cruse fired the last shot at Mr. White) as 97 frames multiplied by 0.034 seconds, or 3.298 seconds.  *See supra* note 5.

of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When it applies this standard, the court views the evidence and draws inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. at 378. An issue of "material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" on the issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And, an issue of fact is "material" if it has the ability to "affect the outcome of the suit under the governing law." *Id.*

The party moving for summary judgment bears the initial burden of showing "the basis for its motion." *Celotex*, 477 U.S. at 323; *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (explaining that the moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law'" (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)). A summary judgment movant can satisfy this burden by demonstrating "that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325; *see also Kannady*, 590 F.3d at 1169 (explaining that, to meet its summary judgment burden, the moving party "need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim" (citation and internal quotation marks omitted)).

If the moving party satisfies its initial burden, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (citation and internal quotation marks omitted); *see also Kannady*, 590 F.3d at 1169 ("If the movant carries [the] initial burden, the nonmovant may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries

the burden of proof." (citation and internal quotation marks omitted)).  To satisfy this requirement, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324 (citation and internal quotation marks omitted).  When deciding whether the parties have shouldered their summary judgment burdens, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.

Summary judgment is not a "disfavored procedural shortcut."  *Celotex*, 477 U.S. at 327.  Instead, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'"  *Id.* (quoting Fed. R. Civ. P. 1).

## IV. Analysis

Officers Cruse and Mackey assert four arguments supporting their summary judgment motion.  The officers argue they deserve summary judgment against:  (1) plaintiff Kelly White's claims asserted individually and on behalf of Mr. White's minor children because only the Estate of Dominique T. White may assert a § 1983 claim relying on a violation of Mr. White's constitutional rights; (2) Count 1's § 1983 claim under the Fourteenth Amendment because the Fourteenth Amendment doesn't apply to plaintiffs' § 1983 excessive force claim; (3) any claim that Officers Cruse and Mackey violated a duty to provide medical care (to the extent plaintiffs make such a claim) because the undisputed facts present no genuine issue whether they failed that duty; and (4) Count 1's § 1983 excessive force claim under the Fourth Amendment asserted against Officers Cruse and Mackey because the officers are entitled to qualified immunity under

the summary judgment facts here.  The court addresses each of the four arguments, in turn, below.

### A.  Plaintiff Kelly White's § 1983 Claim Asserted Individually and on Behalf of Dominique White's Minor Children

*First*, Officers Cruse and Mackey argue plaintiff Kelly White cannot assert a § 1983 claim in his individual capacity or on behalf of Dominique White's minor children based on alleged violations of Dominique White's constitutional rights.  As outlined above, plaintiff Kelly White brings this action individually as a co-administrator of the Estate of Dominique T. White, and as Next Friend for his minor grandchildren against "the individual defendant officers and the City [of Topeka]."  Doc. 43 at 7 (First Am. Compl. ¶ 41).  The officers argue that the only proper plaintiffs in this § 1983 action are Kelly White and Mary Theresa Wynne in their capacities as co-administrators of Dominique White's Estate.  And, the officers contend, the court must dismiss any claims asserted by Kelly White in his individual capacity or on behalf of Dominique White's minor children.

Federal Rule of Civil Procedure 17 governs a party's capacity to sue and be sued.  Rule 17(a) requires that all actions "be prosecuted in the name of the real party in interest."  Fed. R. Civ. P. 17(a).  The Tenth Circuit has explained it is a "well-settled principle that a section 1983 claim must be based on the violation of plaintiff's personal rights, and not the rights of someone else."  *Archuleta v. McShan*, 897 F.2d 495, 497 (10th Cir. 1990).  So, in § 1983 death cases, the Tenth Circuit has held that the proper federal remedy is "a survival action, brought by the estate of the deceased victim, in accord with § 1983's express statement that the liability is 'to the party injured.'"  *Berry v. City of Muskogee*, 900 F.2d 1489, 1506–07 (10th Cir. 1990) (quoting 42 U.S.C. § 1983).

Rule 17(b) provides that, when the party bringing suit acts in a representative capacity, the court must determine the party's capacity to sue under "the law of the state where the court is located."  Fed. R. Civ. P. 17(b)(3); *see also Payne v. McKune*, No. 06-3010-JWL, 2007 WL 1019193, at *1 (D. Kan. Apr. 4, 2007) (explaining that "the court must look to the governing substantive law to determine the appropriate real party in interest" (citing *Esposito v. United States*, 368 F.3d 1271, 1273 (10th Cir. 2004))).  Kansas law requires that a survival action "must be maintained by the personal representative of the decedent, and cannot be brought by the decedent's heirs."  *Payne*, 2007 WL 1019193, at *2 (first citing *Cory v. Troth*, 223 P.2d 1008, 1010–11 (Kan. 1950); then citing *Howe v. Mohl*, 214 P.2d 298, 301 (Kan. 1950)); *see also Estate of Smart v. City of Wichita*, No. 14-2111-EFM, 2018 WL 534335, at *2 (D. Kan. Jan. 24, 2018) ("Under Kansas law, survival claims must be maintained by an administrator of the decedent's estate, and cannot be brought by the decedent's heirs." (citations omitted)).

Here, plaintiffs concede that only the personal representatives of a decedent's estate may bring a § 1983 claim based on his death.  Doc. 58 at 27.  And, they agree that the court should dismiss any claims asserted by plaintiff Kelly White in his individual capacity or on behalf of Dominique White's minor children.  *Id.*  Consistent with the parties' position and Kansas law, the court dismisses plaintiffs' § 1983 claims asserted by plaintiff Kelly White in his individual capacity or on behalf of Dominique White's minor children because Kelly White, acting in those modes of capacity, lacks standing to sue under § 1983.[9]  *See, e.g.*, *Estate of Smart*, 2018 WL 534335, at *4 (permitting plaintiffs to amend their complaint to "mak[e] clear they are prosecuting [decedent's] survival claims as administrators of the estate" and not in their

---

[9]    Since plaintiffs concede that Kelly White can't assert a § 1983 claim in his individual capacity or on behalf of Dominique White's minor children, the court dismisses such claims asserted against either the individual officer defendants or the City of Topeka.

individual capacities as decedent's parents); *Naumoff v. Old*, 167 F. Supp. 2d 1250, 1253 (D. Kan. 2001) (holding that a decedent's mother who asserted a § 1983 claim in her individual capacity—not as the representative of her son's estate—had no standing to assert the § 1983 claim); *Estate of Fuentes ex rel. Fuentes v. Thomas*, 107 F. Supp. 2d 1288, 1295–96 (D. Kan. 2000) (holding that decedent's children did not have standing to assert a claim based on an alleged constitutional violation because "the rights of the decedent . . . may be asserted only by the estate of the decedent").  But the § 1983 claims asserted by plaintiffs in their capacities as co-administrators of Dominique White's estate remain because they are the proper plaintiffs to assert those claims.

### B.  Plaintiffs' Fourteenth Amendment Claim

*Second*, plaintiffs assert a § 1983 claim against the officers for excessive force violating (a) Mr. White's right against unreasonable seizures under the Fourth Amendment to the United States Constitution and (b) his right to due process under the Fourteenth Amendment to the United States Constitution.  Doc. 43 at 5 (First Am. Compl. ¶ 28).  Officers Cruse and Mackey argue that the Fourteenth Amendment doesn't apply to plaintiffs' § 1983 Count 1 claim and, instead, only the Fourth Amendment applies to plaintiffs' § 1983 excessive force claim.  So, they contend, plaintiffs cannot assert their § 1983 claim as violating the Fourteenth Amendment.  Thus, Officers Cruse and Mackey ask the court to dismiss plaintiffs' § 1983 claim premised on a Fourteenth Amendment violation.

In response, plaintiffs concede that the court should dismiss their Fourteenth Amendment claim.  Doc. 58 at 27.  Plaintiffs "agree that their § 1983 claims arise under the Fourth Amendment and that the Fourteenth Amendment does not apply."  *Id.*  The court agrees as well. Our Circuit has explained that the Fourth Amendment applies to excessive force claims arising

from force based on events "'leading up to and including an arrest . . . .'" *Estate of Booker v. Gomez*, 745 F.3d 405, 419 (10th Cir. 2014) (quoting *Porro v. Barnes*, 624 F.3d 1322, 1325–26 (10th Cir. 2010)).  But the Fourteenth Amendment applies to excessive force claims when asserted by a "'pretrial detainee'—one who has had a 'judicial determination of probable cause as a prerequisite to [the] extended restraint of [his] liberty following arrest.'"  *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 536 (1979)).  Here, plaintiffs never allege—and the undisputed facts don't present any genuine issue—that Mr. White was a pretrial detainee when Officers Cruse and Mackey used force against him.  So, consistent with the governing law and plaintiffs' agreement that the Fourteenth Amendment doesn't apply to their § 1983 claim, the court dismisses plaintiffs' § 1983 claim premised on a Fourteenth Amendment violation.

### C.  Failure to Provide Medical Care

Officers Cruse and Mackey assert that—to the extent plaintiffs allege that they violated a duty to provide medical care to Mr. White—the summary judgment facts present no triable issue whether they violated Mr. White's constitutional rights by failing to provide medical care.  Doc. 52 at 37; *see also* Doc. 43 at 4 (First Am. Compl. ¶¶ 23–24).  They argue that the summary judgment facts establish the officers called for emergency medical care within a minute of the shooting.  And, after calling for emergency medical care, Officer Cruse retrieved medical supplies from his patrol car and administered first aid to Mr. White.  Plaintiffs agree that, on the current record, "they do not have sufficient evidence of a violation of a duty to provide medical care to proceed at this point."  Doc. 58 at 28.  And, they concede that the court properly can dismiss this claim.  *Id.* at 27.  The court thus grants summary judgment against plaintiffs' § 1983 claim to the extent plaintiffs base it on a failure to provide medical care.

### D.  Qualified Immunity Against § 1983 Excessive Force Claim

*Finally*, Officers Cruse and Mackey argue that qualified immunity bars Count 1's § 1983 excessive force claim.  Unlike the other issues, this one is hotly contested.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Id.*  "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'"  *Id.* (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004)).

To establish a § 1983 claim against an individual defendant who asserts the defense of qualified immunity, plaintiffs must (1) come forward with facts that "make out a violation of a constitutional right," and (2) demonstrate that "the right at issue was 'clearly established' at the time of defendant's alleged misconduct."  *Id.* at 232 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  A court has discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Id.* at 236.  Addressing the clearly established question first "may avoid the risk of deciding a case incorrectly given insufficient briefing on the constitutional violation question."  *Weise v. Casper*, 593 F.3d 1163, 1167 (10th Cir. 2010) (citing *Pearson*, 555 U.S. at 239).

A right is clearly established when "'there [is] a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts found the law to be as the plaintiff maintains.'"  *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011) (quoting *Stearns v. Clarkson*, 615 F.3d 1278, 1282 (10th Cir. 2010)).  But the "plaintiff cannot simply identify a clearly established right in the abstract and allege that the defendant has violated it." *Herring v. Keenan*, 218 F.3d 1171, 1176 (10th Cir. 2000) (citation and internal quotation marks omitted).  Instead, the court must determine "'whether the violative nature of *particular* conduct is clearly established.'"  *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)).

Conversely, to hold a defendant liable under § 1983, it is not necessary that "'the very action in question has previously been held unlawful.'"  *Id.* at 1866–67 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  Thus, for qualified immunity to apply, the Supreme Court does not require a "reported case directly on point."  *Id.* at 1867 (citation and internal quotation marks omitted).  Instead, the Court's case law requires district courts to evaluate whether "the unlawfulness of the officer's conduct '[is] apparent'" "'in the light of pre-existing law.'"  *Id.* (quoting *Anderson*, 483 U.S. at 640).  This governing standard "'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.'"  *Lane v. Franks*, 573 U.S. 228, 243 (2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).  In short, the doctrine of qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'"  *Ziglar*, 137 S. Ct. at 1867 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

**1.   Do the Undisputed Facts Present a Genuine Issue Whether Officers Cruse and Mackey Violated Mr. White's Fourth Amendment Rights?**

Officers Cruse and Mackey argue that qualified immunity protects them here because the undisputed summary judgment facts present no triable issue whether they used excessive force violating Mr. White's Fourth Amendment rights.  A claim that law enforcement officers have used excessive force to effect a seizure is governed by the Fourth Amendment's "reasonableness" standard.  *Cnty. of L.A. v. Mendez*, 137 S. Ct. 1539, 1546 (2017); *Estate of Larsen ex. rel. Sturdivan v. Murr*, 511 F.3d 1255, 1259 (10th Cir. 2008) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)).  "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake."  *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (further citation and internal quotation marks omitted)).  When performing this analysis, the court must pay "careful attention to the facts and circumstances of each particular case, including the [(1)] severity of the crime at issue, [(2)] whether the suspect poses an immediate threat to the safety of the officers or others, and [(3)] whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.*

The Supreme Court instructs courts to judge the "'reasonableness' of a particular use of force . . . from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight."  *Id.*  This reasonableness inquiry "must always account 'for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'"  *Pauly v. White*, 874 F.3d 1197, 1215 (10th Cir. 2017) (quoting *Graham*, 490 U.S. at 397).  That an officer made a mistake about the need for force does not decide the question

conclusively; rather, the court must analyze the situation as a reasonable officer would have analyzed it in the heat of the moment. *Graham*, 490 U.S. at 396–97. "Ultimately, 'the inquiry is always whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force.'" *Pauly*, 874 F.3d at 1215 (quoting *Estate of Larsen*, 511 F.3d at 1260).

In cases involving deadly force, officers' use of deadly force "is justified under the Fourth Amendment if a reasonable officer in [the defendant officers'] position would have had probable cause to believe that there was a *threat of serious physical harm to themselves* or to others." *Estate of Larsen*, 511 F.3d at 1260 (citation and internal quotation marks omitted). An officer's reasonable, but mistaken, belief that a suspect was likely to use force against the officer renders the use of force objectively reasonable because, as our Circuit has explained, "[a] reasonable officer need not await the glint of steel before taking self-protective action; by then, it is often too late to take safety precautions." *Id.* (citations, ellipsis, and internal quotation marks omitted). To decide whether using deadly force is justified because of the threat of serious physical harm—the second *Graham* factor—the court considers the following "non-exclusive" factors: "'(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect.'" *Tenorio v. Pitzer*, 802 F.3d 1160, 1163 (10th Cir. 2015) (quoting *Estate of Larsen*, 511 F.3d at 1260). And, while these four factors "are quite significant," they are "only aids in making the ultimate determination, which is 'whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force.'" *Id.* at 1164 (quoting *Estate of Larsen*, 511 F.3d at 1260).

Officers Cruse and Mackey argue that they deserve qualified immunity because the undisputed facts establish that the shooting of Mr. White was objectively reasonable. They argue that the three *Graham* factors—(1) the severity of the crime, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight—present no genuine issue whether Officers Cruse and Mackey's use of force was unreasonable. The court analyzes each factor, below.

### a. First *Graham* Factor:  Severity of the Crime

The first *Graham* factor considers the "severity of the crime at issue." *Graham*, 490 at 396. Defendants argue that the officers had probable cause to believe that Mr. White had committed two serious crimes:  (1) unlawfully carrying a concealed weapon, and (2) firing the gunshots heard in the area of Ripley Park. Defendants contend the following facts support that reasonable belief:  Mr. White was carrying a gun, he evaded officers by walking away from them and not responding to their instructions to stop, he stood in a suspicious bent-over stance, and he told the officers that he heard gunshots several blocks away in an attempt to deflect the officers' investigation. Doc. 52 at 24. But the facts as defendants describe them don't faithfully recite the facts in the light most favorable to plaintiffs—the non-moving party. *See Pauly*, 874 F.3d at 1203 (explaining that, on a summary judgment motion based on qualified immunity grounds, the court views the evidence in the light most favorable to the non-moving party); *see also Estate of Larsen*, 511 F.3d at 1259, 1262 (finding that the district court "properly credit[ed] the facts most favorable" to the non-moving party when analyzing summary judgment on qualified immunity grounds).

Nothing in the summary judgment record supports defendants' inference that Mr. White told the officers that he heard gunshots several blocks away as an "attempt to deflect the investigation." Doc. 52 at 24. To draw that inference, the court must conclude that the facts support a finding that Mr. White was the individual who had discharged a firearm in the area of the park and that he then lied about hearing gunshots several blocks away to mislead the officers. This finding would require the court to draw inferences against the non-moving parties. And that's not the proper standard to apply at summary judgment. Also, the officers themselves describe the Ripley Park area as a "high crime area" known as a location where gangs congregated. Doc. 52-2 at 2 (Cruse Decl. ¶ 3); Doc. 52-3 at 2 (Mackey Decl. ¶ 4). In short, and viewing the facts in plaintiffs' favor, it wasn't reasonable for the officers to believe that Mr. White had lied to the officers about hearing gunshots several blocks away when, as the officers concede, they were in an area known for high crime.

Also, nothing in the record supports defendants' characterization of Mr. White's bent-over stance as "suspicious." Although Officer Mackey testified that he thought Mr. White's posture was unusual because "that's not normally how people talk to each other," Doc. 52-6 at 7 (Mackey Dep. 43:5–7), Officer Cruse knew from speaking with the woman he first had encountered that she and Mr. White had argued. Viewing the facts in plaintiffs' favor, a reasonable officer could infer that Mr. White was in his unusual bent-over position because he was upset about the argument. Also, a reasonable officer could infer that Mr. White stood in the bent-over position because he was injured or experiencing some kind of medical problem. Indeed, Officer Cruse asked Mr. White if he was going to be okay and whether he needed an ambulance. Ex. 10 (Cruse Axon video 0:01:06–1:15); *see also* Doc. 52-2 at 3 (Cruse Decl. ¶ 11 (explaining that Officer Cruse "wondered if Mr. White . . . needed medical help")). In sum,

when the court views the evidence in the light most favorable to plaintiffs, it can't infer from the summary judgment facts that Mr. White's bent-over position made him "suspicious" of engaging in criminal activity.

Those conclusions leave the following facts and, defendants contend, viewed in plaintiffs' favor, provided a reasonable officer probable cause to believe that Mr. White had committed a serious crime:  Mr. White was carrying a gun, he lied to the officers about having a weapon, and he didn't comply with their commands.  Even if all of these facts support the officers' reasonable belief that Mr. White had committed the crimes of carrying a concealed weapon unlawfully or discharging a firearm, these crimes range from misdemeanors to felonies depending on other facts involved in committing the crime—facts that Officers Cruse and Mackey knew nothing about when they were interacting with Mr. White.

For example, Kansas criminalizes as a felony possession of a firearm by a convicted felon.  Kan. Stat. Ann. § 21-6304(b).  But, Kansas doesn't prohibit generally the concealed carry of a firearm, unless the person carrying the firearm is otherwise prohibited from possessing a firearm.  *See* Kan. Stat. Ann. §§ 75-7c01–75-7c27 ("The Personal and Family Protection Act"). As one example, carrying a concealed weapon in public by a person who is under 21 years old is classified as a misdemeanor.  Kan. Stat. Ann. § 21-6302(a)(4), (b)(1).  Here, the officers had no information about Mr. White's background or criminal history to support a reasonable belief that he was a felon prohibited from possessing a firearm.[10]  Indeed, Officer Mackey testified that he

---

[10]     Defendants argue that carrying a concealed weapon is a crime of violence under the United States Sentencing Guidelines.  But, to support this argument, they cite an Eleventh Circuit case that analyzed whether a *felony* conviction under a Florida statute prohibiting the carrying of a concealed firearm qualified as a crime of violence for calculating defendant's base offense level under the Guidelines. *United States v. Price*, 132 F. App'x 341, 343 (11th Cir. 2005).  Here, the Florida statute that criminalizes carrying a concealed firearm as a felony isn't at issue.  Also, in Kansas, carrying a concealed firearm isn't a crime, unless the person carrying the firearm is otherwise prohibited from possessing a firearm.  *See* Kan. Stat. Ann. §§ 75-7c01–75-7c27 ("The Personal and Family Protection Act").

didn't recognize Mr. White or know anything about him when the officers made contact with him.  Doc. 52-6 at 6 (Mackey Dep. 41:21–25).  And, Officer Cruse testified that "[a]s far as he knew" when the officers began their struggle with Mr. White, it was legal for Mr. White to carry a firearm.  Doc. 58-2 at 5 (Cruse Dep. 76:6–9).

Also, Kansas criminalizes as a felony the "[r]eckless and unauthorized" discharge of a firearm "at a dwelling, building or structure in which . . . there is a human being present" or "at a motor vehicle . . . in which . . . there is a human being present."  Kan. Stat. Ann. § 21-6308(a)(1)(A)–(B), (b)(1).  But, Kansas law classifies the criminal discharge of a firearm within a city's limits as a misdemeanor.  Kan. Stat. Ann. § 21-6108a(a), (c).  Here, the officers didn't know any facts supporting a reasonable belief that Mr. White had discharged a firearm at a house or at a car, thus violating the felony statute in Kansas.  Instead, viewing the evidence and drawing inferences in the light most favorable to plaintiffs, *Scott*, 550 U.S. at 378, the officers, "[a]t best," had probable cause to believe that Mr. White had committed misdemeanor offenses, *Pauly*, 874 F.3d at 1215.[11]  *See id.* at 1215 & n.5 (finding that the severity of the crime factor favored the plaintiffs—and not the defendant officers—when "[a]t best, the incident might be viewed as a minor crime" classified as a misdemeanor under New Mexico law); *see also Mullins v. Cyranek*, 805 F.3d 760, 766 (6th Cir. 2015) (recognizing that "at the outset" of an encounter, the officer "had probable cause to believe only that [the suspect] had a weapon—a first degree misdemeanor if possessed without a permit" under Ohio law).  And, our Circuit has held that the first *Graham* factor weighs against an officers' use of force when the crime committed "is only a misdemeanor."  *Koch v. City of Del City*, 660 F.3d 1228, 1246–47 (10th Cir. 2011); *see also*

---

[11]     To the extent the officers believed that Mr. White's dishonesty about possessing a firearm and his resistance to the officers' attempts to secure it from him constituted the crime of interfering with a police officer, that crime also is a misdemeanor in Kansas "in the case of a misdemeanor, or resulting from any authorized disposition for a misdemeanor, or a civil case."  Kan. Stat. Ann. § 21-5904(a)(3), (a)(5)(B).

*Donahue v. Wihongi*, 948 F.3d 1177, 1196–97 (10th Cir. 2020) (explaining that "[a] misdemeanor committed in a particularly harmless manner reduces the level of force reasonable for [the officer] to use" and finding that the first *Graham* factor favored plaintiff when the crimes at issue were misdemeanors (citations, ellipses, and internal quotation marks omitted)).

Here, the summary judgment facts—viewed in plaintiffs' favor—present triable issues about the severity of the crimes the officers suspected Mr. White of committing and whether the possibly minor nature of them justified use of deadly force. *See, e.g.*, *Pottorff v. City of Fresno*, No. 1:16-cv-01593-DAD-SKO, 2020 WL 4437606, at *9 (E.D. Cal. Aug. 3, 2020) (holding that genuine issues of fact precluded the court from concluding that severity of the crime element favored officers because possessing a firearm in violation of probation was a misdemeanor offense in California); *Escobedo v. City of Fort Wayne*, No. 1:05-CV-424-TS, 2008 WL 1971405, at *26 (N.D. Ind. May 5, 2008) (finding severity of the crime factor weighed against officers because "[e]ven though police knew [the suspect] had a gun, there is nothing in the record to indicate that officers believed he was a felon in possession of a firearm"); *Torrez v. City of Farmington*, No. 02-1381 MV/RHS, 2004 WL 7338031, at *7 (D.N.M. Sept. 8, 2004) (recognizing that plaintiff "was not accused of a violent crime, and did not face a relatively severe sentence upon conviction" for drug possession and receiving and possessing a stolen firearm and "[a]lthough these crimes are quite serious, they would not appear to justify the same use of force as would a violent crime, such as murder in the first degree, which is a capital crime subject to death or life imprisonment"). Thus, the first *Graham* factor favors plaintiffs.

### b. Second *Graham* Factor:  Whether Mr. White Posed An Immediate Threat to the Safety of the Officers or Others

The court now turns to the second *Graham* factor, which asks "whether the suspect pose[d] an immediate threat to the safety of the officers or others." *Graham*, 490 U.S. at 396.

This second factor "is undoubtedly the 'most important' and fact intensive factor in determining the objective reasonableness of an officer's use of force." *Pauly*, 874 F.3d at 1216 (quoting *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)).  The Circuit "focus[es] mostly on" this factor in "many of [its] excessive force cases[.]" *Id.* (citations omitted).

When a case involves use of deadly force, that kind of force "is only justified if the officer had 'probable cause to believe that there was a *threat of serious physical harm to [himself] or others*.'" *Id.* (quoting *Estate of Larsen*, 511 F.3d at 1260).  As already discussed, to evaluate "the degree of threat facing an officer," the Tenth Circuit examines the "four component test first highlighted in *Estate of Larsen*." *Id.*  The four "non-exclusive" components recited in *Estate of Larsen* are: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Estate of Larsen*, 511 F.3d at 1260.  The court discusses each of these four components, below.

> ### i.     The first *Estate of Larsen* component:  Whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands

Each party asserts that this factor favors its position.  Officers Cruse and Mackey argue that the officers had warned Mr. White about their concern that he had a gun.  The officers told Mr. White they were investigating a gunshot call, and they asked him if he had any guns on his person.  Also, Officer Cruse drew his gun on Mr. White when he reached for the bulge in his back and told Mr. White to keep his hands straight out in front of him.  Mr. White complied.  But after Officer Mackey noticed the gun in Mr. White's pocket, Mr. White ignored the orders to

"lay down" and "stop," he then resisted the officers' attempts to secure the firearm, and he broke free and fled from the officers.

Plaintiffs argue that this factor favors them because the officers never gave Mr. White any orders or any warnings after he broke free from the officers and before they started shooting at him. Officers Cruse and Mackey concede that they gave no orders or warnings in the 1.5 seconds between Mr. White breaking free from their grip and opening fire. But, they argue, it wasn't feasible to issue any orders to Mr. White in that short window of time. And, they contend, it would have been futile to order Mr. White to stop given his aggressive resistance to their attempts to secure the firearm.

The court recognizes that "[a] warning is not invariably required even before the use of deadly force." *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1321 (10th Cir. 2009). The Supreme Court requires officers to give "some warning" before using deadly force but only "where feasible." *Tennessee*, 471 U.S. at 11–12. Our Circuit has treated orders to drop a weapon "as sufficient warning when '[e]vents were unfolding extremely quickly.'" *Samuel v. City of Broken Arrow*, 506 F. App'x 751, 754 (10th Cir. 2012) (quoting *Thomson*, 584 F.3d at 1311). Here, no reasonable jury could doubt that the events unfolded "extremely quickly." *Id.* A matter of seconds passed between Officer Mackey first alerting Officer Cruse that Mr. White possessed a gun and the officers opening fire on him. During that time, officers gave just two warnings to Mr. White: (1) Officer Mackey ordered Mr. White to "lay down," and (2) Officer Mackey told him to stop. Ex. 9 (Mackey Axon video 0:02:23–30). It appears from the video that Officer Mackey also made a short communication over his radio before firing his weapon. *Id.* (Mackey Axon video 0:02:28–30). Officer Cruse never gave any orders to Mr. White after Officer Mackey announced that Mr. White had a gun in his pocket and firing at him. Ex. 10 (Cruse

Axon video 0:01:48–2:00).  And, as defendants concede, neither officer gave any orders to Mr. White after he broke free from their grip and before they began shooting.

From these summary judgment facts, a reasonable jury could conclude that it was unreasonable for the officers to use deadly force on Mr. White without giving him warning about the use of deadly force.  When the officers started shooting, Mr. White didn't have a weapon in his hand, he hadn't threatened officers with violence, and—as discussed comprehensively below—too many fact issues surround the question whether it was reasonable for Officers Cruse and Mackey to believe that Mr. White was reaching for the firearm in his pocket with an intent to withdraw it and fire at the officers or others.  Construing the facts in plaintiffs' favor, a reasonable jury could find that it was feasible for the officers to give Mr. White a warning about the use of deadly force before they opened fire.  *See Pauly*, 874 F.3d at 1216 (finding this factor favored plaintiffs when an expert witness testified that "it was feasible for [the officer] to give the suspect a warning during the five-second interval between when [the suspect] aimed the gun and [the officer] fired his weapon, and that [the officer's] failure to do so was unreasonable").

At the same time, an equally reasonable jury could conclude from these facts that it wasn't feasible for the officers to warn Mr. White because the events were unfolding so rapidly.  *See, e.g.*, *Estate of Valverde ex rel. Padilla v. Dodge*, 967 F.3d 1049, 1061–62 (10th Cir. 2020) ("[W]hen the suspect is not holding a gun when the confrontation begins, officers can do little more than what they did in this case:  order the suspect to raise his hands and get to the ground.").  Also, a reasonable jury could agree with the officers' argument that it would have been futile for the officers to warn Mr. White because he hadn't complied with their earlier orders.  But, to draw that conclusion on summary judgment, the court must construe the facts in the officers' favor.  And that's not the proper standard to apply to this summary judgment

motion.  *See Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (when deciding whether a qualified immunity defense applies on summary judgment, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment" (citations omitted)).

On this summary judgment record, the court finds that the first *Estate of Larsen* component is a neutral one.  Although the officers gave some orders to Mr. White that he refused to follow, the officers never warned Mr. White about the use of deadly force before they fired on him as he was running away without a weapon in his hand.  Thus, this first *Estate of Larsen* factor doesn't favor either plaintiffs or the officers.

> ii.     **The second *Estate of Larsen* component:  Whether any hostile motions were made with the weapon towards the officers**

The second *Estate of Larsen* component favors plaintiffs.  This component asks whether Mr. White made "any hostile motions . . . with the weapon towards the officers."  *Estate of Larsen*, 511 F.3d at 1260.  It is undisputed that Mr. White never removed the gun from his pocket during his entire interaction with officers.  He made no verbal threats.  And he never made any threatening motions with the weapon toward the officers.  This factor thus favors plaintiffs.

The officers argue that it was reasonable for them to perceive as threatening Mr. White's movement of his left hand to the pocket holding the firearm, thus justifying their use of deadly force.  For support, the officers cite a Tenth Circuit case reversing a district court's conclusion "that to justify the use of deadly force, the suspect must have made some verbal threat or gesture directed at the officers."  *Malone v. Bd. of Cnty. Comm'rs for Cnty. of Dona Ana*, 707 F. App'x 552, 556 (10th Cir. 2017) (citation and internal quotation marks omitted).  There, the Circuit explained that "[s]uch a per se rule contradicts the Supreme Court's mandate that a court determine the reasonableness of an officer's use of deadly force based on the totality of the

circumstances." *Id.* Here, the court doesn't conclude that the officers' use of force was unreasonable simply because Mr. White made no verbal threats or gestures with the weapon at the officers. Instead, the court considers this one factor as part of the totality of the circumstances analysis. And, it concludes that this second *Estate of Larsen* factor favors plaintiffs.[12]

> **iii.** **The third *Estate of Larsen* component:  The distance separating the officers and the suspect**

The third *Estate of Larsen* component considers "the distance separating the officers and the suspect." 511 F.3d at 1260. The officers argue that the distance separating them from Mr. White supports use of reasonable force because the weapon at issue was a gun, not a knife or other weapon that requires close proximity to inflict harm. So, the officers argue, the distance between the officers and Mr. White didn't diminish the threat as perceived by an objectively reasonable officer because the suspect was carrying a gun.

Plaintiffs disagree. They argue that this factor favors them because, when the officers opened fire, Mr. White was several feet away from them—without a weapon in hand—and he was running away from the officers. Plaintiffs contend the use of deadly force was unreasonable when Mr. White wasn't approaching the officers in a threatening manner, but instead fleeing from them. *Cf. Estate of Larsen*, 511 F.3d at 1260–61 (finding use of deadly force was objectively reasonable when the suspect "held the high ground vis-a-vis the officers," he "raised the knife blade above his shoulder and pointed the tip towards the officers," he "turned and took a step toward" the officer, and the distance between the suspect and the officer "at the time of the shooting, though disputed, was somewhere between 7 and 20 feet"); *Clark v. Bowcutt*, 675 F.

---

[12]     The court further considers whether it was reasonable for the officers to perceive Mr. White's hand movements as threatening in the analysis of the fourth *Estate of Larsen* component, below.

App'x 799, 810 (10th Cir. 2017) (concluding that use of force was reasonable when "the distance between [the officer] and the front bumper of [the suspect's car] was mere inches, and [the suspect] gave no indication that he would stop, which, taken together, an officer could reasonably perceive as a manifestation of lethal intent").

Here, the court finds, the third *Graham* factor favors plaintiffs, but just slightly. The fact that Mr. White had a gun in his pocket favors the conclusion that the officers' use of deadly force was reasonable. But other facts—viewed in plaintiffs' favor—tip the balance slightly toward plaintiffs. Taking the facts in the light most favorable to plaintiffs, a jury reasonably could conclude that although Mr. White was only a few feet away from the officers when they used deadly force, Mr. White was running away from the officers without a weapon in hand and in an unthreatening manner. The totality of these circumstances presents a triable issue whether it was objectively unreasonable for the officers to believe that Mr. White threatened serious physical harm justifying use of deadly force. The court thus concludes that this factor favors plaintiffs, but just slightly.

> **iv.     The fourth *Estate of Larsen* component:  The manifest intentions of the suspect**

Finally, the court considers the fourth *Estate of Larsen* component—*i.e.*, the manifest intentions of the suspect. Here, the officers argue that—from the perspective of a reasonable officer—Mr. White's manifest intentions support the use of deadly force. The officers assert that Mr. White's dishonesty about having a gun in his possession, his behavior, and his resistance to the officers' attempts to secure the gun support the officers' reasonable belief that Mr. White intended to harm the officers or others with his weapon.

Plaintiffs respond that the facts—viewed in their favor—provide no objective basis for the officers to believe that Mr. White intended to reach for his handgun and fire it at the officers.

Plaintiffs concede that Mr. White had resisted the officers' attempts to secure him, but Mr. White never physically attacked the officers, for example, by punching, kicking, biting, or head butting them. Instead, the video shows that Mr. White only made moves to escape the officers' grip. But he never tried to harm them physically. Also, Mr. White never made any verbal threats to the officers. From these facts, a reasonable jury could conclude that it was objectively unreasonable for the officers to believe that Mr. White manifested an intent to harm the officers or others as he was fleeing from them. *See Pauly*, 874 F.3d at 1219 (concluding that a reasonable jury could find from the facts officers had failed to identify themselves adequately and thus manifest intentions of the suspects were to protect their home from invaders, and not to harm law enforcement); *see also Zia Tr. Co. ex rel. Causey v. Montoya*, 597 F.3d 1150, 1155 (10th Cir. 2010) (concluding that it wasn't clear whether the driver of a vehicle "manifested an intent to harm [the officer] or anyone else at the scene" because "although [the officer] testified in his deposition that he saw [the driver] change gears and that he could see in [the driver's] face what he intended . . . how close [the officer] was and what exactly he could see is disputed").

Also, the parties vigorously dispute whether it objectively was reasonable for the officers to believe that Mr. White was reaching for the gun in his left pocket as he pulled away from the officers' grip. Here, the record contains murky evidence, and the court cannot conclude—as a matter of law—that it was reasonable for the officers to believe that Mr. White was reaching for his firearm, with a manifested intent to withdraw it and fire it at the officers.

The officers argue that it was reasonable for them to perceive Mr. White as a threat because he appeared to reach for his gun while he ran away and looked over his shoulder "to target Officer Mackey." Doc. 52 at 25; *see also id.* at 30 (arguing that Mr. White "also looked over his shoulder, reasonably perceived to be visually checking for a target as he was reaching

for his gun"). The court cannot infer from the summary judgment facts here that Mr. White appeared to "target" Officer Mackey as he was breaking free from the officers. The video shows Mr. White, as he broke free from the officers, slightly turned his face to his left side as he began running away. Doc. 52-10 at 73–78 (Axon video frames 4473–78). Viewing the video in plaintiffs' favor, it doesn't appear that Mr. White ever even looked directly at Officer Mackey. Instead, Mr. White's gaze simply turned to the left for just four frames of the video, or 0.136 seconds. A reasonable jury could conclude from this video that Mr. White simply was glancing to his left and not turning around to "target" Officer Mackey before pulling his weapon and firing it at him. And, under that set of the facts, a triable issue remains whether it was reasonable for the officers to perceive Mr. White as "targeting" Officer Mackey.

Also, a reasonable jury could conclude that it wasn't reasonable for the officers to perceive that Mr. White was reaching for his gun when his left hand neared his left pocket as he was running away. As the video shows, Mr. White moved his left hand near his left hip as he began to run from the officers. *Id.* at 63–79 (Axon video frames 4463–79). And, he took about two-and-a-half steps with his left hand next to his left hip. *Id.* at 69–87 (Axon video frames 4469–87). Plaintiffs argue that it wasn't objectively reasonable for the officers to perceive this hand movement as an attempt to reach for the firearm. Instead, plaintiffs assert, Mr. White's hand movements were part of a normal motion of pulling away from the officers and running away from them. Plaintiffs argue, and the video shows, Mr. White's hand never entered his left pocket, and he never retrieved the gun from his pocket. He never brandished the weapon or even handled it in some other sense. Also, before Mr. White broke free from the officers and ran away, not once had he tried to reach for the gun in his pocket during his interaction with the officers.

36

Plaintiffs also contend that a jury could question the accuracy of the officers' perceptions based on their testimony about the shooting. Indeed, Officer Mackey testified that, as soon as Mr. White broke free, he had a "massive adrenaline dump" that caused "the world [to go] quiet and [he] heard absolutely nothing[.]" Doc. 58-3 at 5 (Mackey Dep. 71:23–72:16). Officer Mackey testified that this caused him to "lose function" and he "heard nothing." *Id.* It also caused him to have "tunnel vision." *Id.* at 5–6 (Mackey Dep. 72:22–73:4). And, Officer Cruse testified that he remembered seeing Mr. White's left hand "going towards the pocket" which "didn't appear to be a fluid motion going forward" and that's when he used deadly force. Doc. 58-2 at 7 (Cruse Dep. 97:15–24). But, he also testified that he didn't remember the specifics of when he pulled his weapon and what Mr. White was doing at the time he began to pull the trigger. *Id.* (Cruse Dep. 97:25–98:6).

This is a close call. The summary judgment standard requires the court to view the facts in plaintiffs' favor. And, using that standard, the court agrees with plaintiffs that a reasonable jury could conclude that reasonable officers would have perceived Mr. White's hand movements as part of the normal motion as he spun out of the officers' grip and began to run away. Still, the court recognizes that these movements occurred under circumstances that were "tense, uncertain, and rapidly evolving" which required the officers to make "split-second judgments" about the need for deadly force. *Pauly*, 874 F.3d at 1215. And, importantly, the officers didn't have the benefit of reviewing Mr. White's movements through the summary judgment lens applied here— *i.e.*, still photographs of events that transpired in just seconds. The court recognizes that it can't view these facts "with 20/20 vision of hindsight" but instead must consider them "from the perspective of a reasonable officer on the scene." *Id.* (citation and internal quotation marks omitted). Nevertheless, viewing the facts and drawing inferences in plaintiffs' favor, these facts

present a triable issue whether it was reasonable for the officers to perceive Mr. White as reaching for the gun in his pocket when his left hand moved near his left side and remained there for less than one second,[13] but never reached into his pocket and never retrieved the firearm— particularly because Mr. White never had made any threats to the officers during their entire interaction.  From these facts, the court can't conclude—as a matter of law—that it was reasonable for the officers to perceive Mr. White as reaching for the gun, thus justifying the use of deadly force.

The court thus concludes that the fourth *Estate of Larsen* component favors plaintiffs, but just slightly.  Viewing the evidence in the light most favorable to plaintiffs, the manifest intentions of Mr. White—viewed from the perspective of a reasonable officer—don't support the use of deadly force when Mr. White never attempted to harm the officers physically, never made any verbal threats, and never brandished or threatened the officers with the firearm.

### v.    Totality of the Circumstances

After considering all four *Estate of Larsen* factors, the court concludes that they present mixed questions whether Mr. White posed an immediate threat to the safety of the officers or others, thereby justifying the officers' use of deadly force.  The *Estate of Larsen* factors mostly favor plaintiffs.  The second component favors plaintiffs, the third and fourth components favor plaintiffs, but just slightly, and the first component is a neutral one.  But, as already discussed, our Circuit has cautioned that the *Estate of Larsen* factors are "only aids in making the ultimate determination, which is 'whether, from the perspective of a reasonable officer on the scene, the

---

[13]     The video shows Mr. White with his left hand near his left hip in frames 4463 to 4487.  Doc. 52-10 at 63–87.  The court calculates the time between these frames as 24 frames multiplied by 0.034 seconds, which equals 0.816 seconds.  *See supra* note 5.

totality of the circumstances justified the use of force.'" *Tenorio*, 802 F.3d at 1164 (quoting *Estate of Larsen*, 511 F.3d at 1260).

The court recognizes that Mr. White was armed, with a gun in his left pocket.  But, as the Fourth Circuit Court of Appeals has recognized, "the mere possession of a firearm by a suspect is not enough to permit the use of deadly force." *Cooper v. Sheehan*, 735 F.3d 153, 159 (4th Cir. 2013).  "[A]n officer does not possess the unfettered authority to shoot a member of the public simply because that person is carrying a weapon." *Id.*  "Instead, deadly force may only be used by a police officer when, based on a reasonable assessment, the officer or another person is *threatened* with the weapon." *Id.*; *see also Reavis ex rel. Coale v. Frost*, 967 F.3d 978, 985 (10th Cir. 2020) ("[D]eadly force is justified only if a reasonable officer in the officer's position would have had probable cause to believe that there was a threat of serious physical harm to himself or others." (citation and internal quotation marks omitted)).

Officers Cruse and Mackey cite several cases which, they contend, support a finding that their use of deadly force was reasonable under the circumstances.  But, each case presents a slightly different factual scenario than this one.  And, importantly, each of the Tenth Circuit cases they cite (and one from our court) involve suspects who had brandished a firearm in the officers' presence and had threatened the officers or others with the firearm, thereby justifying use of deadly force.  *See, e.g.*, *Malone v. Bd. of Cnty. Comm'rs for Cnty. of Dona Ana*, 707 F. App'x 552, 552–54, 556  (10th Cir. 2017) (reversing district court's decision to deny officer qualified immunity on summary judgment where officers knew suspect had pointed a gun at his wife and was a convicted felon, suspect was fleeing police with a revolver in his hand, and suspect ignored the officers' repeated commands that he drop the weapon); *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1318–20 (10th Cir. 2009) (concluding that the use of deadly force was

reasonable when the suspect had pointed a gun at his wife and fled, threated the officers' safety over the phone, and, when confronted by the officers, the suspect had a rifle in his hands, ignored commands to put it down, moved the gun quickly up and down, pointed it toward the officers, and yelled at officers that he would shoot—even though the suspect had the weapon pointed upward toward his head when the officer fired at him); *Phillips v. James*, 422 F.3d 1075, 1083–84 (10th Cir. 2005) (finding use of force reasonable where the suspect acted aggressively, had told officers he would shoot them if they tried to remove him from his home, exited his home carrying a handgun, ignored commands to put down his weapon, and had exclaimed that he had a clean shot at one of the officers immediately before the officers shot him); *Wilson v. Meeks*, 52 F.3d 1547, 1553 (10th Cir. 1995), *abrogated on other grounds by Saucier v. Katz*, 533 U.S. 194, 205 (2001) (holding that officer acted reasonably by shooting suspect who was pointing gun in officer's direction); *Davis v. McCarter*, 569 F. Supp. 2d 1201, 1206–07 (D. Kan. 2008) (finding officer's use of force was reasonable when suspect had endangered the safety of the community by running stop signs and crossing the center lane during a car chase, ran on foot from the officers in a residential neighborhood while holding a gun, ignored several orders to stop and to drop his gun, and kept running with the gun in his hand, thus making it reasonable for the officer "to use deadly force to prevent [the suspect] from locating cover and shooting at [the officer] and his partner, as [the officer] suspected he was planning to do").

In contrast, here, Mr. White never had a weapon in his hand, and he never threatened officers with the weapon, either verbally or physically.  Viewing the evidence in the light most favorable to plaintiffs, the totality of the circumstances shows that (1) Mr. White was in the vicinity of a "high crime" area when someone had reported hearing gunfire near Ripley Park, (2) Mr. White initially ignored officers' commands to stop, (3) Mr. White spoke to officers while in

a bent-over position, (4) the officers knew Mr. White had a firearm in his pocket, (5) the officers

knew nothing about Mr. White's criminal history or right to possess a firearm legally, (6) Mr.

White never threatened the officers physically or verbally, (7) Mr. White never brandished his

weapon, (8) Mr. White refused to comply with officers' attempts to secure the weapon in his

pocket, (9) Mr. White broke free from the officers' grip and began to run away from them, (10)

Mr. White's left hand was near his left pocket for less than one second but never went into his

pocket, grabbed the firearm, or brandished the weapon, and (11) the officers shot Mr. White as

he was running away from them.  These facts present triable issues on the second *Graham*

factor—*i.e.*, whether Mr. White posed an immediate threat to the safety of the officers or others.

But the court can't conclude that these facts establish—as a matter of law—that the officers' use

of deadly force was justified because Mr. White posed an immediate threat to the safety of

officers or others.

### c.  Third *Graham* Factor:  Whether Mr. White Actively Resisted Arrest or Attempted to Evade Arrest by Flight

The last *Graham* factor considers "whether [the suspect] is actively resisting arrest or

attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396.  Plaintiffs concede that this

factor favors Officers Cruse and Mackey.  The video of the officers' encounter with Mr. White

indisputably shows that Mr. White actively resisted the officers' attempts to secure the firearm

and that Mr. White attempted to evade arrest by running away from the officers.  So, the third

and final *Graham* factor favors Officers Cruse and Mackey.

### d.  Conclusion

After considering all three *Graham* factors, the court finds that the first and second

factors favor plaintiffs and the third factor favors the officers.  These factors and the totality of

the circumstances preclude the court from concluding on summary judgment—as a matter of

law—that Officers Cruse and Mackey's use of deadly force was reasonable under the facts here, and thus did not violate Mr. White's Fourth Amendment rights. *See, e.g.*, *Reavis ex rel. Coale v. Frost*, 967 F.3d 978, 986–87, 990–92 (10th Cir. 2020) (affirming decision denying qualified immunity where the first and third *Graham* factors favored the officer but the second *Graham* factor favored plaintiffs because "a reasonable jury could find that [the officer's] use of deadly force was objectively unreasonable under the totality of the circumstances"). More specifically, construing the evidence in the light most favorable to plaintiffs, a rational fact finder could conclude "from the perspective of a reasonable officer on the scene, the totality of the circumstances" didn't support probable cause to believe that Mr. White had committed severe crimes or that he posed a threat of serious physical harm to the officers or others; and so, the court can't conclude—as a matter of law—that Officers Cruse and Mackey were "justified [in] the use of force." *Estate of Larsen*, 511 F.3d at 1260. Thus, the court finds Officers Cruse and Mackey are not entitled to qualified immunity on the ground that no constitutional violation occurred under the first prong of the qualified immunity analysis.

### 2.  Was Mr. White's Constitutional Right Clearly Established?

Officers Cruse and Mackey alternatively argue that, even if the summary judgment facts present a triable issue whether the officers violated Mr. White's constitutional right against excessive force, the officers are entitled to summary judgment against the § 1983 excessive force claim for an independent reason. They argue that the constitutional right was not clearly established when the officers shot Mr. White on September 28, 2017. More specifically, they contend that no United States Supreme Court or Tenth Circuit decisions establish that their use of force against Mr. White under the circumstances presented was unconstitutional. Thus, they

contend, qualified immunity bars plaintiffs' § 1983 claim against them under the second prong of the qualified immunity analysis.

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (citations and internal quotation marks omitted). The Supreme Court has instructed courts not to define the right at issue "'at a high level of generality.'" *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Instead, "the clearly established law must be 'particularized' to the facts of the case." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also Mullenix*, 136 S. Ct. at 308 ("This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." (citation and internal quotation marks omitted)).

This standard doesn't "'require a case directly on point' for a right to be clearly established[.]" *White*, 137 S. Ct. at 551 (quoting *Mullenix*, 136 S. Ct. at 308). Instead, to find that a statutory or constitutional right is "clearly established," "'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* (quoting *Mullenix*, 136 S. Ct. at 308). The precedent clearly establishing a constitutional right must come from "a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Reavis ex rel. Coale v. Frost*, 967 F.3d 978, 992 (10th Cir. 2020) (citation and internal quotation marks omitted).

The court recognizes that the Supreme Court clearly has established that the use of deadly force on a fleeing suspect is "constitutionally unreasonable" "[w]here the suspect poses no immediate threat to the officer and no threat to others[.]" *Tennessee v. Garner*, 471 U.S. 1, 10 (1985). The court already has concluded in the above analysis that the summary judgment facts

present triable issues whether Mr. White posed an immediate threat to the safety of the officers or others.  But, the Supreme Court has warned that the test announced in *Garner* was "cast at a high level of generality."  *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004).  Instead, and as just discussed, the court must ask the question—and decide—whether the officers violated Mr. White's clearly established Fourth Amendment rights "in [a] more particularized sense."  *Id.* (citations and internal quotations marks omitted).  So then, the proper inquiry here asks whether existing precedent would have "place[d] [the officers] on notice that the use of deadly force under the circumstances presented here would result in the violation of a clearly established right."  *Easter v. Cramer*, 785 F. App'x 602, 609 (10th Cir. 2019); *see also White*, 137 S. Ct. at 552 (reversing denial of qualified immunity because the court "failed to identify a case where an officer acting under similar circumstances as [the defendant officer] was held to have violated the Fourth Amendment").

Officers Cruse and Mackey assert that "the law was not clearly established on September 28, 2017 that it was a Fourth Amendment violation to shoot a suspect of shots fired who runs from officers with a gun, who has failed to comply with commands to get on the ground and who has just overcome their efforts to manually control him to prevent his access to the weapon, regardless whether he was immediately reaching for the gun."  Doc. 52 at 35.  To support the officers' argument that the constitutional right at issue wasn't clearly established, the officers cite cases where courts have granted qualified immunity to officers who used deadly force against fleeing suspects carrying firearms because, the courts concluded, an officer doesn't have to wait until a suspect actually uses his weapon before the officers are justified in using deadly force. *See, e.g.*, *Quiles v. City of Tampa Police Dep't*, 596 F. App'x 816, 819–20 (11th Cir. 2015) (granting qualified immunity to an officer who shot a suspect who had resisted officers' efforts

44

to arrest him by twice attempting to run away and fought with another officer, and who the officer believed reasonably (although mistakenly) had stolen and still possessed another officer's gun because "[a]lthough [the suspect] was running away from the officers when he was shot and had not threatened definitely the officers with a gun, the law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect" (citation and internal quotation marks omitted)); *Montoute v. Carr*, 114 F.3d 181, 185 (11th Cir. 1997) (holding officers were entitled to qualified immunity for using deadly force on a suspect who was carrying a shotgun and ignored orders to put it down because it was reasonable for the officers to believe the suspect "might wheel around and fire his shotgun again, or might take cover behind a parked automobile or the side of a building and shoot at the officers or others"); *Davis v. McCarter*, 569 F. Supp. 2d 1201, 1206–07 (D. Kan. 2008) (granting qualified immunity to an officer who used deadly force on a suspect who was running through a residential neighborhood holding a gun and had ignored several orders to stop and drop his gun because "[u]nder the circumstances it was reasonable for [the officer] to use deadly force to prevent [the suspect] from locating cover and shooting at [the officer] and his partner").

The court understands that the facts in these cases differ somewhat from the summary judgment facts presented here. The officers rely on cases where suspects had brandished a firearm before the officers employed deadly force on the suspect. In contrast, here, Mr. White never brandished his firearm. And, he never threatened the officers with the weapon—either physically or verbally. Based on these facts, plaintiffs frame the clearly established Fourth Amendment question differently than the officers do. Plaintiffs pose the question as: "when a fleeing suspect possesses a handgun, but does not brandish or threaten with it, may officers use lethal force on that suspect?" Doc. 58 at 26.

Plaintiffs argue that two Tenth Circuit cases establish clearly that Officers Cruse and Mackey violated Mr. White's constitutional right against excessive force under these facts. *First*, plaintiffs identify *Walker v. City of Orem*, 451 F.3d 1139 (10th Cir. 2006). *Walker* involved a suicidal suspect who was armed with a knife but "had not made any violent threats toward the officers or others." *Id.* at 1159–60. The Tenth Circuit held that the officer's stated belief that the suspect was pointing a gun at him—and not a knife—wasn't reasonable. *Id.* at 1160. Also, the Circuit noted, the suspect "was not actively resisting arrest, and there was no need to use deadly force to prevent him from fleeing and possibly harming others." *Id.* From these facts, the Tenth Circuit held, "where an officer had reason to believe that a suspect was only holding a knife, *not a gun*, and the suspect was not charging the officer and had made no slicing or stabbing motions toward him, that it was unreasonable for the officer to use deadly force against the suspect." *Id.* at 1160 (emphasis added). The Circuit thus concluded the officer wasn't entitled to qualified immunity. *Id.* at 1161.

The facts of *Walker* differ substantially from the facts here. In contrast to *Walker*'s suspect, here, Mr. White possessed a gun—not a knife. Also, the officers knew Mr. White had a gun in his pocket, Mr. White actively resisted the officers' attempts to secure the firearm, and he fled from police officers with the gun still in his pocket. The facts of *Walker* don't "squarely govern[ ]" the specific facts at issue here. *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018). So, the court concludes, *Walker* doesn't clearly establish that the officers violated Mr. White's Fourth Amendment rights by using lethal force on a fleeing suspect who possesses a firearm, even though the suspect hadn't brandished or threatened anyone with the firearm.

*Second*, plaintiffs rely on *Tenorio v. Pitzer*, 802 F.3d 1160 (10th Cir. 2015). *Tenorio* held that qualified immunity didn't protect officers who had responded to a 911 call reporting that the

46

suspect was intoxicated and holding a knife to his own throat.  *Id.* at 1161–62.  The Circuit concluded that the evidence presented a triable issue whether use of force was reasonable where it established "that [the suspect] did not refuse to drop the knife because he was not given sufficient time to comply with [the officer's] order; that [the suspect] made no hostile motions toward the officers but was merely holding a small kitchen knife loosely by his thigh and made no threatening gestures toward anyone; that [the suspect] was shot before he was within striking distance of [the officer]; and that, for all [the officer] knew, [the suspect] had threatened only himself and was not acting or speaking hostilely at the time of the shooting."  *Id.* at 1164–65 (internal quotation marks and ellipsis omitted).

Once again, plaintiffs rely on a case with facts that don't "squarely govern[ ]" the specific facts at issue here.  *Kisela*, 138 S. Ct. at 1153.  *Tenorio* didn't involve a gun.  The suspect had brandished a knife.  And, the officers never gave the suspect time to comply with the officers' orders to drop the knife before using deadly force.  In contrast here, Mr. White possessed a gun, and he had resisted officers' attempts to secure it.  He ignored their orders to lie down and stop, he broke free from the officers' grip as they tried to secure him, and he ran away from the officers with the gun in his pocket.  *Tenorio*'s facts didn't put Officers Cruse and Mackey on notice that using deadly force against Mr. White—under the circumstances presented—violated his clearly established constitutional right under the Fourth Amendment against excessive force.

Plaintiffs also cite *Zia Trust Co. ex rel. Causey v. Montoya*, 597 F.3d 1150 (10th Cir. 2010).  As plaintiffs correctly assert, the Tenth Circuit held in *Zia Trust* that "for the law to be clearly established" it doesn't "require[ ] a court decision with identical facts to establish clearly that it is unreasonable to use deadly force when the force is totally unnecessary to restrain a suspect or to protect officers, the public, or the suspect himself."  *Id.* at 1155 (citation and

internal quotation marks omitted).  But this broad statement from *Zia Trust* didn't put Officers Cruse and Mackey on notice that using deadly force under the circumstances violated clearly established law.  Indeed, the facts of *Zia Trust* differ significantly from the circumstances in which the two officers interacted with Mr. White.  In *Zia Trust*, the Circuit concluded that a reasonable jury could find from the summary judgment facts that the officer, who was responding to a domestic dispute, had acted unreasonably when he shot a man who was backing a van down a driveway because the van appeared to be stuck on a pile of rocks.  *Id.* at 1153–55. Those facts bear no resemblance to this case's summary judgment facts.

Plaintiffs also rely on several cases decided by courts other than the Tenth Circuit.  But, like the cases already discussed, these out-of-Circuit cases involved facts that materially differ from the facts here.  *See, e.g.*, *Weinmann v. McClone*, 787 F.3d 444, 451 (7th Cir. 2015) (finding use of deadly force was unreasonable when officer shot "a suicidal person who [was] neither resisting arrest nor threatening anyone save himself" and instead was "passively sitting in a chair with the gun across his lap"); *Cooper v. Sheehan*, 735 F.3d 153, 155, 159 (4th Cir. 2013) (holding officers' use of deadly force wasn't reasonable when they never identified themselves when responding to a disturbance call at victim's home at night and then shot the victim who "stood at the threshold of his home, holding the shotgun in one hand, with its muzzle pointed at the ground" but he had made "no sudden moves," "no threats," and "ignored no commands" and the officers "had no other information suggesting that [the victim] might harm them"); *Pena v. Porter*, 316 F. App'x 303, 311–12 (4th Cir. 2009) (concluding that "mere presence of a weapon is not sufficient to justify the use of deadly force" and it was unreasonable for officers to use deadly force on a person who "[brought] his gun when he went outside in the middle of the night after being awoken by the sound of his dogs barking and the squawking emanating from his

chicken coops" when the individual wasn't "under arrest at the time of the confrontation" and "was unaware that police officers were outside his trailer when he opened his front door to make sure that his chickens were safe"); *Bouggess v. Mattingly*, 482 F.3d 886, 888–90, 896 (6th Cir. 2007) (holding that officer's use of force was unreasonable when he tried to arrest a suspect during a drug-sting operation, the suspect struggled with the officer, broke free, and ran away from the officer but the officer "did not know or suspect that [the suspect] had a firearm" in his possession); *Baker v. Putnal*, 75 F.3d 190, 198 (5th Cir. 1996) (holding that disputed issues of fact precluded summary judgment on qualified immunity grounds where officer asserted that victim "was holding a semi-automatic pistol, loaded the pistol with ammunition, and leveled it at him from the passenger's side of the vehicle," but three witnesses testified that victim "took no threatening action toward" the officer, and officer and witnesses' accounts conflicted whether the officer had issued any orders to the victim before shooting and disputed whether the victim "was even holding the pistol or pointing it at" the officer).[14]

Significantly, in each of the cases advanced by plaintiffs, the courts found unreasonable the use of deadly force against individuals who hadn't committed at least one of the following

---

[14]     Plaintiffs also cite a case issued by the federal district court in New Mexico. *See* Doc. 58-5 (attaching *Johnson v. City of Roswell*, No. 15-1071 GBW/CG (D.N.M. Aug. 18, 2016) (slip op.)).  In this unpublished opinion, the court recognized—*in the context of denying a motion to dismiss*—that mere possession of a weapon doesn't authorize the use of deadly force without additional evidence that the suspect poses an imminent threat.  *Id.* at 11.  But, *on summary judgment*—in the very same case—the court held that the officer's use of deadly force was reasonable "and, thus, did not violate [p]laintiff's constitutional rights" when "(1) [p]laintiff was holding a firearm in his hand; (2) [p]laintiff had come to the door with the firearm notwithstanding [the officer's] two announcements of 'Roswell Police;' (3) the firearm, while pointed at a downward angle, was (from a right-to-left perspective) pointing toward law enforcement officers; (4) it appeared that the barrel of the firearm was moving upward; (5) moments before, [p]laintiff had been yelling and cursing at either a woman inside the home or the officers or both; and (6) [p]laintiff had earlier fired a round during an argument in his home."  *Johnson v. City of Roswell*, No. 15-1071 GBW/CG, 2017 WL 4083568, at *6–7 (D.N.M. Sept. 13, 2017), *aff'd* 752 F. App'x 646 (10th Cir. 2018).  The court doesn't find that the New Mexico court's discussion in an unpublished opinion ruling *a motion to dismiss* with very different facts from the ones presented here on summary judgment suffices to put Officers Cruse and Mackey on notice that they violated a clearly established constitutional right by using deadly force against Mr. White.

acts:  (1) possessed a firearm (or the officers had no reason to believe the individual was carrying a firearm); (2) resisted officers; or (3) ignored police commands.  In contrast, here, Mr. White committed all three acts:  (1) Mr. White possessed a firearm in his left pocket—something Officer Mackey observed and then alerted Officer Cruse to its presence; (2) Mr. White resisted officers' attempts to secure his firearm; and (3) he ignored their commands to lie down and to stop.

None of these cases clearly establish that an officer violates the Fourth Amendment by using deadly force against a suspect who possesses a gun (but hasn't brandished it or threatened anyone with it), ignores officers' commands to lie down and stop, resists officers' attempts to secure the weapon, breaks free from the officers' grip, and flees from the officers.  These cases, simply, aren't "close enough on point to make the unlawfulness of the officers' actions apparent."  *Mascorro v. Billings*, 656 F.3d 1198, 1208 (10th Cir. 2011).

Plaintiffs haven't discharged their responsibility to come forward with "clearly established weight of authority from other courts" that have "found the law to be as the plaintiff maintains."  *Reavis*, 967 F.3d at 992.  In our Circuit, once an individual defendant asserts a qualified immunity defense, the plaintiff bears the burden of showing:  "(1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct."  *Margheim v. Buljko*, 855 F.3d 1077, 1087 (10th Cir. 2017) (citations and internal quotation marks omitted).  Plaintiffs have failed to shoulder that burden because they haven't identified any Supreme Court or Tenth Circuit precedent clearly establishing that Officers Cruse and Mackey violated Mr. White's Fourth Amendment constitutional right because they used deadly force on a fleeing suspect who possessed a firearm, but had not brandished or threatened anyone with the firearm.

Here, the court takes the clearly established question—framed differently by both parties—and crafts the issue based on the actual "situation [Officers Cruse and Mackey] confronted." *Brosseau*, 543 U.S. at 200 (citation and internal quotation marks omitted). Viewing the facts comprising that situation in the light most favorable to plaintiffs, the court asks:  In September 2017, was it a clearly established Fourth Amendment violation to use deadly force on a suspect who was carrying a firearm in the pocket of his pants, where the suspect had ignored officers' orders to lie down and stop, resisted officers' efforts to secure the gun, broke free from the officers as they attempted to secure the weapon, and ran from the officers with the gun still in his pocket, even though the suspect hadn't brandished the weapon or otherwise threatened the officers with his weapon?

The court hasn't identified one case that put Officers Cruse and Mackey on notice that the law was clearly established in September 2017—when they used deadly force on Mr. White—that Mr. White didn't present a risk to the officers or others based on these summary judgment facts.  To the contrary, the court has identified cases where courts have held—before September 2017—that officers' use of deadly force was justified where the officer reasonably believed the suspect possessed a gun and the suspect was resisting or fleeing from law enforcement, even if the suspect never threatened the officers.  *See, e.g*, *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) (holding officer's use of deadly force against an armed suspect was objectively reasonable "[r]egardless of whether [the suspect] had drawn his gun" because "[the suspect's] gun was available for ready use, and [the officer] was not required to wait and hope[ ] for the best" and explaining that "[t]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect" (citations and internal quotation marks omitted)); *Henning v. O'Leary*, 477 F.3d

492, 496 (7th Cir. 2007) (affirming summary judgment against an excessive force claim where suspect resisted arrest, an officer's gun became unholstered during the struggle, and at least two officers believed the suspect had his hands on or near the officer's gun, and finding "[p]olice officers cannot be expected to wait until a resisting arrestee has a firm grip on a deadly weapon and completely freed himself from officers trying to subdue him before taking action to ensure their safety"); *Anderson v. Russell*, 247 F.3d 125, 130–31 (4th Cir. 2001) (affirming summary judgment against excessive force claim where officer reasonably believed suspect was armed with a handgun (even though the bulge the officer observed in suspect's waistband later was determined to be an eyeglasses case) and suspect initially put his hands in the air in response to officers' commands but then "lower[ed] his hands in the direction of the bulge in disregard of the officers' order," and concluding that the officer "acted reasonably by firing on [the suspect] as a protective measure before directly observing a deadly weapon"); *Thompson v. Hubbard*, 257 F.3d 896, 898–99 (8th Cir. 2001) (affirming summary judgment against excessive force claim because officer's use of deadly force was reasonable, even though it later was determined that the suspect possessed no weapon because the suspect had fled from an officer investigating an armed robbery, he moved his arms around and obscured them from the officer's view, he ignored officer's commands to stop, and when he moved his arms again, officer shot him, and explaining that "[a]n officer is not constitutionally required to wait until he sets eyes upon the weapon before employing deadly force to protect himself against a fleeing suspect who turns and moves as though to draw a gun"); *Slattery v. Rizzo*, 939 F.2d 213, 215–17 (4th Cir. 1991) (reversing denial of qualified immunity to officer who shot suspect detained in a narcotics sting operation after the suspect ignored multiple orders to put his hands up, the officer couldn't see the suspect's left hand clearly but could see it was partially closed around an object, and the suspect

had turned his upper body toward the officer causing him to believe the suspect "was coming at him with a weapon" even though the object in the suspect's hand later was determined to be a beer bottle); *see also George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) (recognizing the Fourth Amendment doesn't "always require[ ] officers to delay their fire until a suspect turns his weapon on them" and "[i]f the person is armed . . . a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat").[15]

The facts are even more compelling here when compared with the facts presented by many of the cases described above. Unlike other cases where officers learned later that the suspect wasn't armed, the officers here actually knew Mr. White had a gun in his pocket. Officer Mackey saw the gun in Mr. White's pocket, and Officer Cruse later recovered it (along with additional magazines) from Mr. White's pocket. Mr. White resisted the officers' attempts to secure the weapon, and he ignored their commands to lie down and stop. Instead, Mr. White struggled against the officers' attempts to secure the firearm, he broke free from them, and he ran away while armed with a gun in his pocket. After reviewing the relevant case law, the court concludes the law wasn't clearly established that Officers Cruse and Mackey violated Mr. White's Fourth Amendments rights under the circumstances of this case. So, the court holds that the officers are entitled to qualified immunity. And, the court thus grants summary judgment

---

[15]    The court also finds the Supreme Court's decision in *Kisela v. Hughes* instructive. 138 S. Ct. 1148 (2018). Although *Kisela* was decided in 2018—after the September 28, 2017 shooting at issue, here—the Supreme Court considered whether an officer had violated clearly established law in May 2010, when he used deadly force against woman who was behaving erratically. *Id.* at 1151, 1154. The Court determined that no clearly established law prohibited the officers' use of force in May 2010 against an individual armed with a knife, within striking distance of a bystander, who ignored commands to drop the weapon, and the situation unfolded in less than a minute. *Id.* at 1154. Similarly, here, Mr. White was armed with a weapon—one he could access within a split-second—and within striking distance of the officers, he ignored officers' commands, and the situation unfolded in seconds.

against plaintiffs' § 1983 claim for excessive force violating the Fourth Amendment, as alleged against Officers Cruse and Mackey in Count 1.

**V.      Conclusion**

For reasons explained, the court grants defendants Michael Cruse and Justin Mackey's Motion for Summary Judgment (Doc. 51).

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants Michael Cruse and Justin Mackey's Motion for Summary Judgment (Doc. 51) is granted.

**IT IS SO ORDERED.**

**Dated this 28th day of September, 2020, at Kansas City, Kansas**

<u>**s/ Daniel D. Crabtree**</u>
**Daniel D. Crabtree**
**United States District Judge**